998 P.2d 833 (2000)
140 Wash.2d 475
In the Matter of the DISCIPLINARY PROCEEDING AGAINST Lowell K. HALVERSON, an Attorney at Law.
No. 01518-0.
Supreme Court of Washington, En Banc.
Argued October 14, 1999.
Decided April 27, 2000.
*836 David Allen, Seattle, for Petitioner.
Andrea A. Darvas, Washington State Bar Disciplinary Counsel, Seattle, for Respondent. *834
*835 IRELAND, J.
In this Washington State Bar Association (WSBA) disciplinary case, this Court must determine (1) whether the WSBA Disciplinary Board (the Board) properly found that Lowell Halverson's sexual relationship with a dissolution client resulted in his violation of Rules of Professional Conduct (RPC) 1.7(b), 1.4(b) and 2.1, but did not result in a violation of RPC 1.8(b) and 1.13(a), and Rules for Lawyer Discipline (RLD) 1.1; and (2) whether the Board properly sanctioned Halverson with a six-month suspension and two-year probation. We affirm the Board's determination as to whether or not there was a violation of each of the charges, but increase the suspension to one year, finding the lesser sanction inadequate to serve the purposes of attorney discipline.

FACTS
Lowell K. Halverson has been a member of the WSBA in private practice since 1968, concentrating on family law for the last 20 years. He has lectured and published extensively in this area. From 1990-91, Halverson served as president of the WSBA.
Although Halverson has been married to his wife, Diane, since 1964, he admits that since the early 1970s he has had consensual sexual relationships with six different female clients. Five of these clients retained Halverson as their attorney before the sexual relationship began. The most recent of these relationships was with Lisa Wickersham, the grievant in this action. Halverson first met Wickersham in 1989 when Wickersham accompanied a friend to Halverson's office. At this point, Wickersham was married to an attorney, Neil Sarles.
During this office visit, Halverson gave Wickersham and her friend a personality questionnaire that he regularly used with clients; he also asked Wickersham if she might like to work in his office on a special project involving artwork. Following this meeting, Wickerhsham worked at Halverson's office for a few months until early in 1990.
Wickersham retained Halverson as her attorney in May 1991, at which time Halverson administered another personality questionnaire. Wickersham's testimony conflicts as to whether her intention at this point was a trial separation from her husband or dissolution. In any event, Halverson filed a dissolution petition on her behalf in June 1991, and Wickersham moved out of her husband's house in early July.
Later in July while at Halverson's office, Wickersham confided to him that she was "attracted to [her] attorney." Report of Proceedings (RP) at 509. Shortly thereafter, following a successful court appearance, Halverson took Wickersham on a tour of photographs displayed at the Rainier Club in Seattle. According to Halverson, while on the *837 tour, Wickersham suggested that they get a room, but Wickersham denies this occurred.
Both agree, however, that after the tour they went to a restaurant on the waterfront where they expressed a mutual attraction and discussed Halverson's "ground rules" for a potential relationship: Halverson's wife could not find out about the affair and there could be no bonding between Halverson and Wickersham's young daughter. According to Halverson, he explained to Wickersham that a potential relationship between them would not be of any significance to the pending divorce action if these "ground rules" were followed. Wickersham herself recognized the need for them to be discreet because of Halverson's high profile as president of the WSBA.
Halverson, however, did not advise Wickersham of the possible ramifications if the relationship were to become known. For example he did not tell her that, if Sarles were to discover the relationship, he would most likely become less willing to compromise in the divorce proceeding and that this would increase the complexity and cost of the dissolution and could impact the custody determination. Neither did Halverson advise Wickersham that either his wife's or Sarle's discovery of the affair could lead to his withdrawal as her attorney.
Halverson and Wickersham agreed to see each other within the next few weeks when Halverson's wife left on a trip to Australia. After Halverson's wife left the country, Wickersham called Halverson at his office and they made plans to get together. At Halverson's home that evening, Halverson and Wickersham had sexual intercourse while Wickersham's young daughter slept in the next room. For the next six months, Wickersham and Halverson maintained a sexual relationship seeing each other whenever they could.
On January 1, 1992, Halverson's wife discovered the affair. Within a few days, Halverson withdrew as Wickersham's attorney because he felt that he had lost his objectivity and could no longer keep his roles separate, particularly in view of his wife's position as his office manager. Halverson temporarily moved out of his home and continued his personal relationship with Wickersham for several weeks. In mid-February, however, Halverson told Wickersham that he was returning to his wife.
Meanwhile, Halverson provided Wickersham with the names of several other attorneys who could take over her case. Although Wickersham wanted Halverson to continue as her attorney, he refused, and Wickersham, thus, hired another attorney, Eric Watness, to complete her dissolution. Halverson transferred the balance of Wickersham's account to Watness and wrote off her outstanding bill to him. There is no evidence that Halverson at any time revealed any client confidences or otherwise used information obtained from Wickersham.
Wickersham did not tell Watness about her relationship with Halverson until almost three months after she retained him. Watness believed Wickersham was "at times anxious, particularly fixated on the relationship between herself and Mr. Halverson, at times unable to focus off of that and onto resolution of issues, development of facts, that sort of thing." RP at 576. Nonetheless, Watness also testified that Wickersham assisted him on her case "in an intelligent and competent way." RP at 573. Watness represented Wickersham until September 1992, when her case settled and a decree of dissolution was entered. Overall, Watness felt Wickersham received a "fair outcome" in her case. RP at 559.
A year later in October 1993, Wickersham complained to the WSBA about Halverson's conduct and, in 1994, filed a civil lawsuit. Wickersham's civil suit against Halverson settled in 1995 by sealed agreement for a substantial sum and with no admission of liability. Wickersham's former husband subsequently sued Wickersham and received one-half of the settlement.
The WSBA filed a formal complaint against Halverson in February 1997. Following proceedings in December 1997 and February 1998, the hearing officer issued findings of fact and conclusions of law and recommended a sanction consisting of six months' suspension and two years' probation with the conditions that Halverson disclose to *838 female clients the purpose of his discipline and continue treatment with his mental health physician.
Halverson appealed the hearing officer's decision to the Board. The 14-member Board unanimously upheld the hearing officer's findings of fact and conclusion that Halverson violated RPC 1.7(b). By split decision, the Board rejected the hearing officer's conclusions that Halverson violated RPC 1.8(b) and 1.13(a) but did not violate RPC 1.4(b), and approved the hearing officer's conclusions that Halverson violated RPC 2.1 but did not violate RLD 1.1 and 2.8. Also by split decision, the Board approved the hearing officer's recommended sanction.
Halverson appealed the Board's decision to this Court challenging four of the hearing officer's factual findings and the Board's adverse conclusions of law. He also claims that the sanction was too harsh. The WSBA in turn assigned error to the Board's conclusions that no violations of RPC 1.8(b) and 1.13 and RLD 1.1 occurred, and to the Board's failure to impose a harsher sanction. Based on these facts, we will address Halverson's challenges to the factual findings and the parties' respective challenges to the Board's legal conclusions and recommended sanction in turn.

ANALYSIS
I. FACTUAL FINDINGS
Halverson challenges several of the Board's factual findings. He claims that both Finding of Fact 28[1] and Finding of Fact 33[2] are not supported by substantial evidence. As to Finding of Fact 33, Halverson relies on testimony from three witnesses establishing that Wickersham received a "`very good'" outcome in her case. Opening Br. of Resp't at 18 (quoting RP at 439).
Halverson claims that Finding of Fact 29[3] is not actually a factual finding but rather a "generality, observation, or policy statement." Opening Br. of Resp't at 24. Finally, Halverson challenges Finding of Fact 32[4] arguing that Wickersham should have known what harm might result from the relationship because she was a willing participant. He further relies upon expert testimony that an attorney-client sexual relationship should not be relevant under the current no-fault divorce statutes.
Generally, in bar discipline cases, this Court does not review unchallenged factual findings made by the hearing officer and unanimously affirmed by the Board; they are accepted as verities. See In re Disciplinary Proceeding Against Johnson, 118 Wash.2d 693, 701, 826 P.2d 186 (1992) (citing *839 In re Disciplinary Proceeding Against Curran, 115 Wash.2d 747, 759, 801 P.2d 962, 1 A.L.R.5th 1183 (1990)). Even when unanimously approved findings are challenged as they are here, we will not disturb them if supported by the clear preponderance of the evidence. See In re Disciplinary Proceeding Against McMullen, 127 Wash.2d 150, 161-62, 896 P.2d 1281 (1995) (citing, inter alia, Curran, 115 Wash.2d at 759, 801 P.2d 962).
Although the hearing examiner's findings are not conclusive, they are entitled to considerable weight, particularly when the credibility and veracity of witnesses are at issue. McMullen, 127 Wash.2d at 162, 896 P.2d 1281 (citing In re Disciplinary Proceeding Against Allotta, 109 Wash.2d 787, 793-94, 748 P.2d 628 (1988)). This Court will not substitute its evaluation of the credibility of the witnesses over that of the hearing examiner. McMullen, 127 Wash.2d at 162, 896 P.2d 1281 (citing Allotta, 109 Wash.2d at 794, 748 P.2d 628).
Here, each of the challenged findings is supported by a clear preponderance of the evidence. Regarding Finding of Fact 28, Halverson offers no authority or citation to the record to undermine this finding. Further, the record is clear that Wickersham depended upon Halverson regarding temporary living arrangements, custody of her daughter, and a favorable property division in her dissolution action.
As to the power imbalance, an experienced family law practitioner testified to the inherent power imbalance in a dissolution attorney-client relationship. In addition, Dr. Laura Brown, a psychologist who studies sexual relationships between clients and professionals, testified that Halverson's administration of personality tests to Wickersham "added a more psychological aura to what he was doing" and, therefore increased "the risk of harm because the power differential was greater." RP at 157. According to Dr. Brown, Halverson's status as Wickersham's former employer further contributed to a power differential.
As to Finding of Fact 33, the testimony that Wickersham received a "fair outcome" in her dissolution proceeding does not undermine the substantial testimony from mental health professionals that as a result of Halverson's conduct, Wickersham suffered personal harm in the form of depression and anxiety. RP at 342. In addition, Wickersham's relationship with Halverson had an adverse impact upon her relationship with her former husband. In the years following the divorce, Wickersham described the relationship as "brutally adversarial; abusive and emotionally and financially difficult." RP at 339. Further, after her relationship with Halverson, Wickersham was unable to trust her new attorney.
Regarding Finding of Fact 29, the statement about the quasi-therapeutic nature of the attorney-client relationship in a dissolution action is based on the testimony of at least two experts and on Halverson's own book on divorce law, which was admitted as an exhibit. Thus, even if the first part of the finding is a generalization, it is one supported by the clear preponderance of the evidence. See Para-Medical Leasing, Inc. v. Hangen, 48 Wash.App. 389, 397, 739 P.2d 717 (1987) (a factual finding is a "determination from the evidence of the case" (citation omitted)). Halverson's argument, therefore, must fail.
As to Finding of Fact 32, Halverson's admission to sexual relationships with five prior clients clearly supports the finding that he knew or should have known the risks of such relationships, particularly because one of these relationships resulted in a fee dispute where the client threatened to disclose the details of the relationship to Halverson's wife unless Halverson wrote off his bill.
Further, Halverson's book, Divorce in Washington: A Humane Approach,[5] discouraged those involved in a dissolution from getting involved in a new sexual relationship. A section in the Washington Family Law Deskbook of which Halverson was editor and chief,[6] and the written materials for a Continuing Legal Education course at which Halverson spoke, both discussed the potential *840 adverse ramifications of an attorney-client sexual relationship, as did three prominent family law attorneys who testified.
Where the evidence conflicted as to the potential effect of the Wickersham/Halverson affair upon Wickersham's dissolution proceeding, the hearing officer was entitled to credit the testimony of those experts who testified that the affair increased the legal risks to Wickersham. See In re Disciplinary Proceeding Against Felice, 112 Wash.2d 520, 525, 772 P.2d 505 (1989) (court will not disturb hearing examiner's findings of fact made upon conflicting evidence). Finally, Halverson's argument that Wickersham should have known the harm that might result from the relationship is irrelevant as to the issue of his knowledge of the risks that his conduct imposed upon his client.
II. LEGAL CONCLUSIONS
In a bar disciplinary case, challenges to conclusions of law will fail if the conclusions are supported by the factual findings. Curran, 115 Wash.2d at 759, 801 P.2d 962. "Pursuant to RLD 4.11(b), counsel for the WSBA has the burden of establishing an act of misconduct by a clear preponderance of the evidence." In re Disciplinary Proceeding Against Haskell, 136 Wash.2d 300, 309-10, 962 P.2d 813 (1998). A clear preponderance is an intermediate standard between the simple preponderance required in a civil suit and the reasonable doubt standard in a criminal action. Haskell, 136 Wash.2d at 310, 962 P.2d 813.
Unlike in a civil malpractice suit for damages, a disciplinary proceeding does not require a showing of actual harm. "[A] lawyer may be disciplined even if the misconduct does not cause any damage. The rationale is the need for protection of the public and the integrity of the profession." Hizey v. Carpenter, 119 Wash.2d 251, 262, 830 P.2d 646 (1992) (quoting 1 Ronald E. Mallen & Jeffrey M. Smith, Legal Malpractice § 1.9, at 33 (3d ed.1989)). With these principles in mind, we address the parties' respective challenges to the Board's conclusions of law.
A. Violation of RPC 1.7(b)[7]  Duty to Avoid Conflicts of Interest
"RPC 1.7(b) generally prevents a lawyer from representing a client if that representation will be materially limited by the lawyer's own interests unless the lawyer reasonably believes the representation will not be affected and the client consents in writing." McMullen, 127 Wash.2d at 164, 896 P.2d 1281 (emphasis added). Halverson concedes no written consent was obtained, but argues that this was merely a technical violation of the rule. We disagree.
It was not objectively reasonable for Halverson to believe that the representation would not be adversely affected by the sexual relationship, nor did Halverson disclose to Wickersham the risks involved or the material implications of the sexual relationship upon the dissolution proceeding. Consequently, Halverson's failure to obtain written consent was more than a mere technical violation of the rule.
Halverson should have known that discovery of the affair could worsen the relationship between Wickersham and Sarles and, thus, unnecessarily complicate the dissolution proceeding. Further, Halverson should have known that the affair could impact the custody determination of Wickersham's daughter. Finally, Halverson should have known that discovery of the affair by his wife might lead to his withdrawal as Wickersham's attorney. Thus, Halverson's subjective belief that the relationship would not adversely affect the representation was not objectively reasonable.
*841 In any event, Halverson did not disclose any of these risks to Wickersham before commencing the relationship. Rather, the "ground rules" discussed at the start of the relationship focused primarily on Halverson's own interests: keeping the relationship secret from his wife and avoiding any emotional bonding with Wickersham's daughter. Under these circumstances, the Board properly affirmed the hearing officer's conclusion that Halverson violated RPC 1.7(b).
B. Violation of RPC 1.4(b)  Duty to Communicate
Pursuant to RPC 1.4(b), "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." We agree with the Board that the same failures to disclose supporting the conclusion that Halverson violated RPC 1.7(b) also support the conclusion that he violated RPC 1.4(b).[8]
C. Violation of RPC 2.1  Duty to Exercise Independent Professional Judgment
"In representing a client, a lawyer shall exercise independent professional judgment and render candid advice. In rendering advice, a lawyer may refer not only to law but to other considerations such as moral, economic, social and political factors, that may be relevant to the client's situation." RPC 2.1.
As recently noted by the Court of Appeals in a criminal case where the defendant claimed ineffective assistance of counsel, a lawyer who "commences a sexual relationship with the client during the course of the representation... creates significant but needless risks that emotions arising from the relationship will impair ... his or her ability to `exercise independent professional judgment'...." State v. Stough, 96 Wash.App. 480, 486 & n. 21, 980 P.2d 298, review denied, 139 Wash.2d 1011, 994 P.2d 846 (1999) (quoting RPC 2.1). Although we do not adopt a per se rule that a lawyer who commences a sexual relationship with a client always fails to exercise independent professional judgment, we find that under the circumstances here Halverson violated RPC 2.1
Halverson did not exercise independent professional judgment when he failed to (1) advise Wickersham of the potential ramifications the affair might have on the dissolution or his ability to represent her; (2) advise Wickersham of his published professional opinion that persons involved in a dissolution should be discouraged from getting involved in a new sexual relationship; and (3) take precautions to avoid pregnancy or discuss with Wickersham the consequences of such event. Thus, we affirm the Board's conclusion that Halverson violated RPC 2.1.
D. No Violation of RPC 1.8(b)  Duty to Avoid Using Information Related to Representation of a Client to Client's Disadvantage
Pursuant to RPC 1.8(b), "A lawyer who is representing a client in a matter: ... (b) Shall not use information relating to representation of a client to the disadvantage of the client unless the client consents in writing after consultation." Here, there is no evidence that Halverson used any information against Wickersham that was obtained in the course of representing her.
*842 Further, an unchallenged factual finding states: "There is no evidence that [Halverson] at any time divulged any client confidences of [Wickersham]." CP at 674. Consequently, the Board properly concluded that Halverson did not violate RPC 1.8(b). See Johnson, 118 Wash.2d at 701, 826 P.2d 186 (unchallenged factual findings are accepted as verities on appeal); Curran, 115 Wash.2d at 759, 801 P.2d 962 (challenges to a hearing examiner's conclusion of law will fail if conclusions are supported by factual findings).
E. No Violation of RPC 1.13(a)  Duty to Maintain Normal Client-Lawyer Relationship with Client Under an Impairment/Disability
RPC 1.13(a) provides:
When a client's ability to make adequately considered decisions in connection with the representation is impaired, whether because of minority, mental disability or for some other reason, the lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client.
Here, there was no evidence that Wickersham suffered from a mental disability either during her sexual relationship with Halverson or subsequently. Although there was evidence that Wickersham had difficulty focusing on the dissolution after Halverson withdrew as her attorney, there was no evidence that during the course of Halverson's representation Wickersham had an impaired ability to make adequately considered decisions. In fact, her new attorney testified that she assisted him on her case "in an intelligent and competent way." RP at 573. Thus, the Board properly concluded that although emotionally vulnerable, Wickersham did not suffer from the type of impairment or disability covered by RPC 1.13(a).
F. No Violation of RLD 1.1  Commission of Act of Moral Turpitude
RLD 1.1 provides in pertinent part:
A lawyer may be subjected to the disciplinary sanctions or actions set forth in these rules for any of the following:
(a) The commission of any act involving moral turpitude, dishonesty, or corruption, or any unjustified act of assault or other act which reflects disregard for the rule of law, whether the same be committed in the course of his or her conduct as a lawyer, or otherwise, and whether the same constitutes a felony or misdemeanor or not....
The WSBA argues that Halverson's acts constituted moral turpitude citing, In re Disciplinary Proceeding Against Heard, 136 Wash.2d 405, 963 P.2d 818 (1998); Heinmiller v. Department of Health, 127 Wash.2d 595, 903 P.2d 433, 909 P.2d 1294 (1995); and Haley v. Medical Disciplinary Bd., 117 Wash.2d 720, 818 P.2d 1062 (1991). Halverson claims that these cases are distinguishable. We agree.
Heard states that: "Despite the absence of an express rule banning attorney-client sexual relations, an attorney's sexual relations with a client can constitute `moral turpitude,' justifying the imposition of disciplinary sanctions." 136 Wash.2d at 419, 963 P.2d 818. Heard's client was a 23-year-old woman who suffered from a mental disability as a result of injuries from a motorcycle accident, and who also had drug and alcohol problems. All of this was known to Heard. Nonetheless, during the course of settlement negotiations, Heard went to the client's home, took her to two cocktail lounges where they both consumed alcohol, had her drive his vehicle while intoxicated, and then took her to his apartment where they had consensual sexual relations. Heard, 136 Wash.2d at 409-12, 963 P.2d 818.
This Court concluded that "Heard's use of his professional position to exploit a vulnerable young woman constituted moral turpitude within the meaning of RLD 1.1." Heard, 136 Wash.2d at 422-23, 963 P.2d 818 (footnote omitted). However, this Court also made clear that not all attorney-client sexual conduct violates RLD 1.1:
By our opinion, however, we do not announce a general rule regarding attorney-client sexual conduct. This issue may be addressed in the normal course of the judicial rule-making or decision-making process. However, where an attorney so blatantly misuses his professional status to *843 exploit a client's vulnerability, the Board is entirely justified in finding the conduct to be an act of moral turpitude under RLD 1.1.
Heard, 136 Wash.2d at 423 n. 9, 963 P.2d 818.
Heard was based on Haley, a case involving a physician-patient sexual relationship. There, Haley, a 66-year-old surgeon, operated on a 16-year-old patient and, thereafter, over the next two years provided the girl with alcohol and engaged in a sexual relationship with her. Haley, 117 Wash.2d at 722-25, 818 P.2d 1062. Haley was given a 10-year stayed suspension on grounds his acts constituted moral turpitude.[9]Haley, 117 Wash.2d at 726, 818 P.2d 1062.
This Court also followed the Haley holding in Heinmiller, where we found a social worker's sexual relationship with a former patient that began one day after the conclusion of counseling constituted moral turpitude. 127 Wash.2d at 604-06, 903 P.2d 433. The finding of moral turpitude in Heinmiller rested on expert testimony establishing bright line rules in the social work profession prohibiting counselor-patient sexual relations for a period of time even after the discontinuance of therapy. See Heinmiller, 127 Wash.2d at 605, 903 P.2d 433.
Here, the aggravating factors present in Heard and Haley do not exist. Wickersham was not a juvenile. She did not suffer from a mental disability or a drug and alcohol addiction. Halverson did not supply her with intoxicants. Thus, Halverson did not "blatantly misuse[] his professional status to exploit [his] client's vulnerability...." Heard, 136 Wash.2d at 423 n. 9, 963 P.2d 818.
Further, unlike in Haley and Heinmiller, a bright line rule prohibiting attorney-client sexual relations does not exist. Finally, Halverson's conduct was not an unsolicited advance because Wickersham was arguably the initiator of the relationship. See Heard, 136 Wash.2d at 420, 963 P.2d 818 (quoting People v. Good, 893 P.2d 101 (Colo.1995)) ("`Because the lawyer stands in a fiduciary relationship with the client, an unsolicited sexual advance by the lawyer debases the essence of the lawyer-client relationship.'" (emphasis added)). Consequently, the Board properly found that under the circumstances Halverson's affair with Wickersham did not constitute moral turpitude.
III. SANCTION
We will first discuss the standards that the Board[10] must apply when recommending a disciplinary sanction and then discuss the standards this Court applies when reviewing the Board's recommended sanction.
A. Sanction Standards
The American Bar Association's Standards for Imposing Lawyer Sanctions (1991 ed. & Feb. 1992 Supp.) (hereafter ABA Standards) govern bar discipline cases in Washington. In re Disciplinary Proceeding Against Boelter, 139 Wash.2d 81, 99, 985 P.2d 328 (1999); Johnson, 118 Wash.2d at 701, 826 P.2d 186; In re Disciplinary Proceeding Against Lynch, 114 Wash.2d 598, 610, 789 P.2d 752 (1990). After a finding of lawyer misconduct, the Board engages in a two-step process to determine the proper sanction.
First, the Board must determine a presumptive sanction by considering (1) the ethical duty violated; (2) the lawyer's mental state; and (3) the extent of the actual or potential harm caused by the misconduct. Johnson, 118 Wash.2d at 701, 826 P.2d 186; ABA Standards Std. 3.0. As to mental state, the Board must determine whether the lawyer acted intentionally, knowingly, or negligently. McMullen, 127 Wash.2d at 169, 896 P.2d 1281 (citing ABA Standards Std. 3.0 and commentary). In deciding the extent of the actual or potential harm, the Board should consider the "harm to a client, the public, the legal system or the profession *844 that is reasonably foreseeable at the time of the lawyer's misconduct...." ABA Standards, Definitions at 7. The potential for injury caused by the lawyer's misconduct need not be actually realized. ABA Standards Std. 3.0 commentary.
Second, the Board considers whether there are aggravating or mitigating factors[11] that should lead to an alteration of the presumptive sanction or affect the length of a suspension. Johnson, 118 Wash.2d at 701, 826 P.2d 186 (citing, inter alia, Curran, 115 Wash.2d at 771, 801 P.2d 962); see also ABA Standards Std. 2.3 commentary ("The specific period of time for the suspension should be determined after examining any aggravating or mitigating factors....").
Here, as discussed above, the Board properly determined that Halverson violated his duties to avoid conflicts of interest, RPC 1.7(b); to communicate material information, RPC 1.4(b); and to exercise independent professional judgment, RPC 2.1, but did not commit ethical violations with respect to the remaining charges. Thus, when the Board determined its recommended sanction it considered the relevant ethical violations.
As to mental state, the Board also properly determined that Halverson acted knowingly. The ABA Standards define "knowledge" as the "conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." ABA Standards, Definitions at 7. Although there is no evidence that Halverson intended to harm Wickersham or the legal profession, the evidence clearly establishes that Halverson was aware that his entry into a sexual relationship with Wickersham during her dissolution proceedings exposed her to serious psychological and legal risks. Further, Halverson must have known that the inconsistency of his personal conduct and his published professional advice, in conjunction with his status in the legal community, would result in harm to the integrity of the profession.
As to the Board's consideration of the actual or potential harm, it is not clear from the record whether the Board considered the actual or potential injury to the legal profession from Halverson's conduct. The record, however, demonstrates that the Board properly considered the substantial personal harm actually suffered by Wickersham as well as the potential for her legal injury.
In light of the above factors, particularly the determination that Halverson acted knowingly, the Board properly concluded that suspension should be the presumed sanction, as opposed to disbarment or a mere reprimand. The ABA Standards state: "Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client." ABA Standards Std. 4.32; see also ABA Standards Std. 7.2 (suspension is presumed sanction for knowing violation of duty to the legal profession).[12]
*845 Washington's Rules for Lawyer Discipline provide that suspensions from the practice of law should be "for an appropriate fixed period of time not exceeding 2 years." RLD 5.1(b). Additionally, this Court has previously recognized that suspensions "generally should last for a period of time not less than six months and not greater than three years." Boelter, 139 Wash.2d at 101, 985 P.2d 328; McMullen, 127 Wash.2d at 170, 896 P.2d 1281.
This six month to three year range of suspensions is based upon the commentary to Standard 2.3 of the ABA Standards, which states in pertinent part:
While the Model Rules for Lawyer Disciplinary Enforcement (see MRLDE 25) currently provide for suspensions of less than six months, short-term suspensions with automatic reinstatement are not an effective means of protecting the public. If a lawyer's misconduct is serious enough to warrant a suspension from practice, the lawyer should not be reinstated until rehabilitation can be established....
In reality, a short-term suspension functions as a fine on the lawyer, and fines are not one of the recommended Sanctions in the MRLDE.
The amount of time for which a lawyer should be suspended, then, should generally be for a minimum of six months. ... The specific period of time for the suspension should be determined after examining any aggravating or mitigating factors in the case.
ABA Standards Std. 2.3 (1991 ed. & Feb. 1992 Supp.)(emphasis added).
Although six months is the generally accepted minimum term of suspension, this Court has occasionally imposed a shorter term of suspension when a less severe suspension is warranted by specific mitigating circumstances or when aggravating circumstances justify a more severe sanction than a letter of censure.[13]See, e.g., Johnson, 118 Wash.2d at 697, 705, 826 P.2d 186 (60-day suspension appropriate where attorney voluntarily reaffirmed contractual obligations to client in bankruptcy proceedings; court declined to impose six month suspension because it would have "drastic effect" upon Johnson's ability to continuing repaying his clients); In re Disciplinary Proceeding Against Felice, 112 Wash.2d 520, 772 P.2d 505 (1989) (30-day suspension rather than mere censure appropriate for neglect of guardianship duties where attorney had substantial experience, refused to acknowledge wrongdoing and where client was 86 years old and incompetent).
We next consider whether the Board properly examined the mitigating and aggravating factors to decide whether such factors warranted an alteration of the presumed sanction, Johnson, 118 Wash.2d at 701, 826 P.2d 186, and, if not, what affect such factors should have on the length of suspension. See ABA Standards Std. 2.3, at 8 (rules), 20-21 (commentary). Here, the Board concluded that the aggravating and mitigating factors effectively cancelled each other out.
As aggravating factors, the Board found that Halverson had (1) substantial experience in the practice of law, yet he had (2) engaged in a pattern of misconduct; (3) committed multiple offenses (4) against a vulnerable victim; and (5) refused to acknowledge wrongdoing. As mitigating factors, the Board found that Halverson (1) had no prior disciplinary record; (2) suffered from depression during the affair with Wickersham; (3) has an excellent professional reputation; (4) has taken rehabilitative steps; and (5) has been otherwise sanctioned through negative publicity.
While we find that the Board properly considered all of these aggravating and mitigating factors,[14] except Halverson's *846 excellent professional reputation as a mitigating factor,[15] we do not agree that an approximately equal number of aggravating and mitigating factors necessarily warrants a minimal suspension. Rather, a minimal suspension seems more appropriate in a case where there are either no aggravating factors and at least some mitigating factors, or where the mitigating factors clearly outweigh any aggravating factors.[16] Consequently, the Board's recommended sanction of six months' suspension appears inadequate where there were at least five aggravating factors.
B. Standards for Washington State Supreme Court's Review
This Court has the exclusive responsibility to determine what discipline should be imposed for a lawyer's acts of misconduct. In re Disciplinary Proceeding Against Heard, 136 Wash.2d 405, 423, 963 P.2d 818 (1998) (citing, inter alia, In re Disciplinary Proceeding Against Felice, 112 Wash.2d 520, 526, 772 P.2d 505 (1989)); RLD 2.1. Thus, we are not bound by the Board's sanction recommendation. Heard, 136 Wash.2d at 423, 963 P.2d 818. Where such recommendation is insufficient to protect the public and the administration of justice or to preserve the integrity of the legal profession, we will modify it.[17]In re Disciplinary Proceeding Against McGough, 115 Wash.2d 1, 9, 793 P.2d 430 (1990).
However, we will adopt the Board's sanction recommendation unless we can articulate specific grounds based on one or more of the following factors to support departing from the Board's recommendation: (1) the purposes of attorney discipline; (2) the proportionality of the sanction as compared to sanctions imposed in similar cases; (3) the effect of the sanction on the attorney; (4) the record developed by the hearing panel; and (5) the extent of agreement among the Board members. Heard, 136 Wash.2d at 423-24, 963 P.2d 818 (citing cases).
Regarding the first factor, the purposes of sanctions for lawyer misconduct are to: (1) protect the public and the administration of justice; (2) preserve the integrity of the legal profession and to maintain public *847 confidence therein; (3) deter the offending lawyer from further unethical conduct, and where appropriate to rehabilitate the lawyer; and (4) deter all members of the profession from unethical conduct. ABA Standards Std. 1.1 and commentary; McMullen 127 Wash.2d at 163, 896 P.2d 1281; Allotta, 109 Wash.2d at 792, 748 P.2d 628.
Under the circumstances here, we are persuaded that a six-month suspension is inadequate to maintain public confidence in the integrity of the legal profession and deter others from such conduct. As a frequent lecturer and extensive publisher in the family law area, and as the past president of the WSBA, other attorneys as well as the public looked to Halverson for advice. His book demonstrates not only that he knew of the serious psychological and legal risks entering into a new sexual relationship presented to a dissolution client but that he specifically advised others against it. Yet, Halverson knowingly carried on his affair with Wickersham while he was president of the WSBA.
His practice of using personality questionnaires increased his clients' perceptions of him as a personal counselor or quasi-therapist and engendered their trust. Yet, Halverson violated the trust Wickersham placed in him by taking advantage of her status as his dissolution client for his own sexual gratification.
What seems most lacking in the Board's sanction determination is the fact that Halverson engaged in a pattern of misconduct. By his own admission, he has engaged in a sexual relationship with six clients. We find the contradiction between Halverson's published professional advice and status in the legal community, and his personal conduct particularly damaging to the integrity of the legal profession.
Furthermore, a minimal six-month suspension in this high profile case would fail to inform the public and warn other attorneys that this Court takes such misconduct seriously. See In re Disciplinary Proceeding Against Kennedy, 97 Wash.2d 719, 723, 649 P.2d 110 (1982) ("as a function of preserving public confidence, punishment of an attorney is sometimes necessary to deter others and to indicate our legal system's intolerance of [mis]conduct"). Thus, we find that the first factor  the purposes of attorney discipline  warrants increasing the suspension to one year.
As to the proportionality factor, this Court has stated: "The principle of consistency alone ... cannot determine the length of the suspension" and "[c]onsistency within a jurisdiction is more important than consistency between jurisdictions."[18]Curran, 115 Wash.2d at 773, 801 P.2d 962. Here, a one-year suspension is not inconsistent with the two-year suspension imposed in the only other bar disciplinary case in Washington involving sexual misconduct. See Heard, 136 Wash.2d 405, 963 P.2d 818.
The conduct in Heard was much more egregious than here; in fact, we recognized that there were arguable grounds for Heard's disbarment. Heard, 136 Wash.2d at 425, 963 P.2d 818. Heard not only had sexual relations with a much more vulnerable client than Wickersham but also violated several rules of professional conduct "by negotiating a settlement agreement with worthless interests included, advising his client to sign it, and then keeping all the cash proceeds of the settlement without the client's consent or without rendering the client a final accounting." Heard, 136 Wash.2d at 409, 963 P.2d 818. Thus, although a two-year suspension or disbarment would not be proper for Halverson, a one-year suspension does not constitute a disproportionate sanction.
As to the effect of the sanction on Halverson, we acknowledge that it is substantial. However, when we weigh the hardship imposed *848 on Halverson against the serious nature of his misconduct, the sanction is not excessive.
The considerations that this Court relies upon to support its one-year suspension are amply supported by the record. Finally, although we recognize that none of the Board members recommended a suspension longer than six months, we emphasize that this Court, and not the Board, is ultimately responsible for determining the nature of lawyer discipline.[19]Heard, 136 Wash.2d at 423, 963 P.2d 818.

CONCLUSION
In conclusion, we uphold all the Board's factual findings, its conclusions of law, and the conditions of the two-year probationary period. We increase the recommended term of suspension from six months to one year to adequately serve the purposes of attorney discipline.
SMITH, MADSEN, ALEXANDER, TALMADGE, JJ., COLEMAN, J.P.T, and GROSSE, J.P.T., concur.
JOHNSON, J. (concurring and dissenting).
While I agree with the majority's conclusion upholding the Disciplinary Board's (Board) approval of all findings of fact, and its substantive conclusions of law, I dissent from the majority's escalation of respondent's suspension in disregard of the Board's recommended sanction.
Importantly, neither the hearing examiner, who presided over the testimony in this case, nor any of the 15 lawyer and layperson Board members recommended a suspension greater than six months. While I agree with the majority we are not bound by the Board's recommendation, we have said:
The only body in the state to consider the full spectrum of disciplinary matters from the most trivial to the most serious is the Disciplinary Board. It is appropriate, therefore, that we give serious consideration to the recommendations of the Disciplinary Board. As the only body to hear the full range of disciplinary matters, the Board has the opportunity to develop unique experience and perspective in the administration of sanctions. We should not lightly depart from recommendations shaped by this experience and perspective.
In re Disciplinary Proceeding Against Noble, 100 Wash.2d 88, 94, 667 P.2d 608 (1983); see In re Disciplinary Proceeding Against Johnson, 114 Wash.2d 737, 751-52, 790 P.2d 1227 (1990).[1] A sanction supported by *849 unanimous recommendation will also not be rejected "`in the absence of clear reasons.'" In re Disciplinary Proceeding Against Heard, 136 Wash.2d 405, 424, 963 P.2d 818 (1998) (emphasis added) (quoting Johnson, 114 Wash.2d at 752, 790 P.2d 1227). While the Board members were not in unanimous agreement on the specific length of the appropriate sanction, there was complete agreement that a sanction greater than six months was not warranted.
Ultimately, the sanction this court imposes is designed to protect the public and deter further misconduct, and not to punish. In re Disciplinary Proceeding Against Hankin, 116 Wash.2d 293, 298, 804 P.2d 30 (1991) (citing Noble, 100 Wash.2d at 95, 667 P.2d 608). Here, the majority concludes the Board properly determined that suspension is the presumptive sanction, and that the aggravating and mitigating factors are equal. Majority at 844-846; see In re Disciplinary Proceeding Against Haskell, 136 Wash.2d 300, 321, 962 P.2d 813 (1998) (holding approximately equal number of aggravating and mitigating factors cancel each other out). Nevertheless, the majority then asserts that some factors are more equal than others and doubles the Board's highest recommended sanction. Majority at 846, 847. In so doing, the majority relies most heavily on the pattern of prior sexual misconduct by Halverson, see majority at 847, despite the fact only Halverson's relationship with Wickersham is currently before this court.
By incorrectly ascribing such significance to matters outside the record, the majority forgets the following: (1) a motion to consolidate the misconduct grievances of four former clients was denied; (2) we know none of the facts and circumstances surrounding these prior incidents; and (3) none of the four former clients testified under oath or were subject to cross-examination.[2] The existence of Halverson's prior relationships was admitted into evidence solely to establish Halverson's state of mind. Both the Board majority and hearing examiner concluded that Halverson acted knowingly. Therefore, it is difficult to understand how the majority, by agreeing with the Board and hearing examiner on this issue and with such limited information concerning Halverson's prior relationships, can justify its twofold increase of the Board's recommended sanction. The majority's decision appears more an attempt to punish Halverson than to follow our disciplinary standards. The conduct that is the subject of the grievance, applied to our existing ethical rules, should be the issue, and not the "high profile" nature of this case. Majority at 847.
This is the first time this court has held a consensual sexual relationship between attorney and client by itself may violate the Rules of Professional Conduct.[3] Prior to this case, the matter may have been an open issue, especially in light of this court's rejection of the proposed rule explicitly forbidding attorney-client sexual relations.[4] This must be compared to other cases relied upon by the majority, which almost exclusively involve misappropriations of client property, where this court has departed from Board recommendations because well established precedent compelled such a result. See, e.g., In re Disciplinary Proceeding Against Petersen, 120 Wash.2d 833, 864-67, 846 P.2d 1330 (1993) (listing cases establishing disbarment as proper sanction for conversion of *850 client funds absent "`extraordinary mitigating circumstance[s]'"); In re Disciplinary Proceeding Against McGough, 115 Wash.2d 1, 13, 793 P.2d 430 (1990) (noting that precedent clearly established disbarment as presumed sanction for conversion of client funds); Johnson, 114 Wash.2d at 752, 790 P.2d 1227 (noting that the "usual sanction" for conversion of client funds is disbarment).
Compounding the problem is the majority's erroneous labeling of six months as the presumptive minimum suspension that may be issued in this jurisdiction. Majority at 845. This is directly contradicted by our own court rules. Washington's Rules of Lawyer Discipline establish a maximum suspension of two years, but no minimum. RLD 5.1(b); see also RLD 8.1 (differentiating between responsibilities of lawyers suspended for less than 60 days and lawyers suspended for greater than 60 days).
Prior reported decisions of this court are also replete with examples of suspensions totaling less than six months. E.g., In re Disciplinary Proceeding Against Gillingham, 126 Wash.2d 454, 469, 896 P.2d 656 (1995) (60-day suspension); In re Disciplinary Proceeding Against Johnson, 118 Wash.2d 693, 708, 826 P.2d 186 (1992) (60-day suspension); In re Disciplinary Proceeding Against Burtch, 112 Wash.2d 19, 29, 770 P.2d 174 (1989) (45-day suspension); In re Disciplinary Proceeding Against McLeod, 104 Wash.2d 859, 865, 711 P.2d 310 (1985) (90-day suspension); Noble, 100 Wash.2d at 98, 667 P.2d 608 (90-day suspension); In re Disciplinary Proceeding Against Kennedy, 97 Wash.2d 719, 723, 649 P.2d 110 (1982) (60-day suspension); In re Disciplinary Proceeding Against Orton, 97 Wash.2d 243, 245, 643 P.2d 448 (1982) (Stafford, J., concurring) (arguing for more severe sanction of 60 days). Finally, orders of this court continue to reflect numerous suspensions of less than 6 months. E.g., In re Disciplinary Proceeding Against Brothers, No. 09653 (Wash. Supreme Ct. Dec. 6, 1999) (order approving stipulation to suspension).
Our holding here that this type of conduct can violate the existing ethical rules in this state will sufficiently deter similar conduct by others, and the majority offers no reason why a suspension of one year rather than six months is needed to preserve public confidence. Cf. Noble, 100 Wash.2d at 95, 667 P.2d 608 ("the Board's recommendation may be modified where the recommended sanction is clearly insufficient to protect the public from future misconduct of the kind at issue and to deter other attorneys from such misconduct." (emphasis added)). The majority is inappropriately making an example of the respondent rather than establishing an interpretation of our ethical rules to apply in similar situations.
I would defer to the Board's determinations in this case and adopt its recommended six-month suspension.
SANDERS, J. (concurring in part, dissenting in part).
I dissent from the majority's determination that Lowell Halverson violated his duty to communicate or failed to exercise independent professional judgment and did not render candid advice. Further, because Halverson acted negligently and not knowingly, I conclude that a reprimand is a sufficient sanction.

Standard of Proof in Attorney Discipline Cases is High
Although the majority recognizes counsel for the Washington State Bar Association (WSBA) must prove allegations of misconduct by a clear preponderance of the evidence, Majority at 840, the majority does not appear to appreciate the weight of the burden placed on the accuser:
Every doubt should be resolved in his [the attorney's] favor, and only upon a clear preponderance of the evidence that the acts charged have been done, and were prompted by improper motives, should disciplinary action be taken. The privilege and it is a privilege, not a rightto practice his profession cannot be lost to the practitioner upon slight evidence.
In re Discipline of Little, 40 Wash.2d 421, 430, 244 P.2d 255 (1952). Further, the trier of fact's determination that the prosecution has failed to meet its burden ends the inquiry and the appellate court may *851 not reassess the credibility of testimony given to question those who actually viewed the evidence firsthand. State v. Camarillo, 115 Wash.2d 60, 71, 794 P.2d 850 (1990).

Findings of Fact
By upholding certain challenged findings of fact, the majority demonstrates its paternalistic perception of female dissolution clients. The majority opines "Wickersham depended upon Halverson," Majority at 839, and claims a "power imbalance" Halverson allegedly exercised in his representation of female dissolution clients. Majority at 839. These views are more in the nature of conclusions than facts. See Para-Medical Leasing, Inc. v. Hangen, 48 Wash.App. 389, 397, 739 P.2d 717 (1987). Conclusions are reviewed de novo. City of Redmond v. Central Puget Sound Growth Management Hearings Bd., 136 Wash.2d 38, 46, 959 P.2d 1091 (1998). However these conclusions are neither supported by the facts of this case nor based on human experience:
The tenacious image of the vulnerable, needy, childlike woman is nowhere more prevalent than in the discussion of a female divorce client. Having lost her husband, she is described as emotionally unstable, feeling unattractive, and anxious to receive the attention and approval of another man. One judge mused about the vulnerability of the female divorce client:
We conjure up with ease the client entering her lawyer's office. Her marriage has collapsed and she is concerned about her failed relationship. Perhaps she has been rejected by her spouse. More often than not, she has serious financial problems which may present her with areas of stress with which she has not previously been required to cope. Her children may be severely disturbed over the failed marriage and the pulling and tugging by the parents which is generally attendant to these situations. As she walks through the door of the office, at last she finds someone who cares about her problem, someone who will protect her legally and someone whom she can trust.
Linda Fitts Mischler, Reconciling Rapture, Representation, and Responsibility: An Argument Against Per Se Bans on Attorney-Client Sex, 10 Geo. J. Legal Ethics 209, 240-41 (Winter 1997) (Greiman, J., concurring) (footnote omitted) (quoting In re Marriage of Kantar, 220 Ill.App.3d 323, 163 Ill.Dec. 55, 581 N.E.2d 6, 13 (1991)).
Viewing female dissolution clients as "victims" who need the support, assistance and guidance of their powerful male attorneys is degrading because it undermines women's right of independent self-determination. Moreover it does not accurately portray the dynamics of an attorney-client relationship.[1] Rather it is the client who has the power to choose her attorney from the multitude of attorneys competing to gain her business. It is the client who has the power to determine the objectives of the representation and whether to accept or reject an offer of settlement. See Rules of Professional Conduct (RPC) 1.2(a) ("A lawyer shall abide by a client's decisions concerning the objectives of the representation.... A lawyer shall abide by the client's decision whether to accept an offer of settlement of a matter."). It is the client who has the power to terminate the services of her lawyer for any reason or no reason at all. It is the client who has the power to sue an attorney if he fails to adequately represent her wishesa power successfully exercised by Halverson's client here. See Majority at 837 ("Wickersham's civil suit against Halverson settled in 1995 by sealed agreement for a substantial sum....").[2] And it was this client who chose to *852 initiate and enter a consensual sexual relationship with her attorney.
While rules governing attorney-client sex appear to control male sexualityby disciplining attorneys who engage in the sexual relationships, the vast majority of whom are malethey indirectly control female sexuality by denying self-determination to female clients who desire a dual relationship with an attorney.
Mischler, supra, Reconciling Rapture, Representation, and Responsibility at 235. Thus, characterizing Halverson's client as a defenseless victim subject to the overwhelming power of her attorney is inaccurate, not supported by the record, and inconsistent with the legal entitlements of all concerned.
The majority also improperly focuses on the emotional harm which purportedly befell Halverson's client as a result of their affair. "[A]s a result of Halverson's conduct, Wickersham suffered personal harm in the form of depression and anxiety." Majority at 839. While this may be true, broken hearts and personal disappointments are not the proper subjects of an attorney discipline proceeding which must focus on state licensure requirements. The Illinois Appellate Court reasoned in an analogous situation:
[T]o allow an action for legal malpractice based upon the fact that an intimate relationship occurred between the attorney and his client during the course of the legal relationship, when supported only by damages such as mental anguish, shame, humiliation, injury to feelings, defamation, or some unspecified injury to character, would be tantamount to allowing a claim for seduction, alienation of affections, or criminal conversion to proceed under less strict standards than required by statute for actions of this type, merely by virtue of the fact that the parties involved happened to have met in the context of a legal relationship.
Suppressed v. Suppressed, 206 Ill.App.3d 918, 565 N.E.2d 101, 106 n. 3, 151 Ill.Dec. 830 (1990). While we may consider actual or potential harm caused by the violation of an ethical duty to determine a presumptive sanction, it is not proper to consider personal harm unrelated to the violation of an attorney's ethical duty to faithfully represent the legal interests of his client in a legal setting. As the professional conduct rules do not require lawyers to avoid hurt feelings or disappointment resulting from the termination of a personal relationshipeven if that relationship involved a clientconsideration of Wickersham's emotional harm is improper.[3]

RPC 1.7(b)  Duty to Avoid Conflicts of Interest
As an initial matter, I am not persuaded that a consensual sexual relationship between an attorney and his clientinitiated by the clientinherently creates a potential conflict of interest.
A sexual relationship with a client, however, does not inherently create a contrary interest. As long as the intimate relationship remains intact, the interests of the attorney and client are not incompatible per se. Indeed, they are strongly aligned. The personal relationship may strengthen the representation, increasing the zeal with which the attorney approaches the case.
Mischler, supra, Reconciling Rapture, Representation, and Responsibility at 228 (footnote omitted).
And if, as the majority concludes, Halverson unreasonably believed that a sexual relationship with his client would not affect the representation, his failure to obtain his client's written consent after full disclosure is irrelevant. Rule of Professional Conduct 1.7(b) makes clear that a lawyer shall not represent a client unless the lawyer both: (1) reasonably believes the representation will not be adversely affected, and (2) obtains written client consent after fully disclosing the material facts. RPC 1.7(b). Thus, the majority's statement "nor did Halverson disclose to Wickersham the risks involved or the material implications of the sexual relationship upon the dissolution proceeding," Majority at 840, is beside the point as Halverson's violation of RPC 1.7(b) could not have been avoided even if he had obtained his client's *853 informed written consent, unless we first conclude he could have reasonably concluded the representation would not be adversely affected. As disciplinary board member and former appellate judge Charles Wiggins aptly recognized in his dissent to the Board majority opinion: "It makes little sense to analyze the ways in which Halverson failed to disclose the conflict he failed to recognize." Dissenting Opinion at 3 (WSBA Disciplinary Board, Oct. 5, 1998) (hereinafter Wiggins Dissent).

RPC 1.4(b)  Duty to Communicate
Without analysis, the majority holds: "We agree with the Board that the same failures to disclose supporting the conclusion that Halverson violated RPC 1.7(b) also support the conclusion that he violated RPC 1.4(b)."[4] Majority at 841. This conclusion is erroneous for several reasons.
As an initial matter, the hearing officer found no violation of this rule. Accordingly, there are no findings of fact to explain what Halverson failed to disclose to enable his client to make informed decisions regarding the representation. As the hearing officer comprehensively chronicled even irrelevant facts (finding of fact 21 states "[d]uring sexual intercourse, the couple did not utilize birth control"), it is consistent to presume the hearing officer would have made explicit findings detailing what Halverson improperly failed to disclosehad Halverson failed to communicate necessary matters to his client. Not only did the hearing officer refuse to find facts indicating Halverson violated RPC 1.4(b), the facts actually found by the hearing officer suggest Halverson did not violate RPC 1.4(b).
14. Ms. Wickersham knew that Respondent was married. The couple discussed the need for an agreement that Respondent's wife not find out about any relationship between them.

15. Respondent advised Ms. Wickersham that their intimate relationship would need to be separate from the lawyer-client relationship. Respondent also advised that he desired his contact with Ms. Wickersham's minor child to be kept to a minimum and that he not "bond" with the child.
Findings of Fact, Conclusions of Law and Order for Further Hearing at 6 (WSBA Disciplinary Board, Jan. 8, 1998) (emphasis added). Although the Board may be allowed in certain cases to make additional findings based on new evidence taken on administrative appeal, the Board is not allowed to ignore the examiner's findings and replace those with new ones based on previously considered evidence. See In re Disciplinary Proceeding Against Lynch, 114 Wash.2d 598, 608, 789 P.2d 752 (1990). Accordingly, the WSBA has failed to prove Halverson violated RPC 1.4(b) by any measure of evidence much less a clear preponderance.
In addition to the absence of findings to prima facie satisfy the requisite elements of proof, the Board's conclusion that Halverson violated RPC 1.4(b) is based on the erroneous premise that Halverson should have obtained his client's informed, written consent prior to beginning their sexual relationship. See Opinion at 16 (WSBA Disciplinary Board, Oct. 5, 1998). As explained above, Halverson's conceded failure to obtain his client's informed consent is immaterial as Halverson violated RPC 1.7(b) by failing to recognize the representation could be adversely affected by a sexual relationship with his client.
Further the majority's unquestioning deference to the Board's conclusion that Halverson violated RPC 1.4(b) is misguided when the underlying purposes of RPC 1.4(b) are considered. The American Bar Association's (ABA) annotation of Model Rules of Professional Conduct explains:
The client should have sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued, to the extent the client is willing and able to do so.
Annotated Model Rules of Professional Conduct Rule 1.4 cmt. at 53 (2d ed. 1992). This comment illustrates the purpose of RPC 1.4(b) is to facilitate the client's participation in her representation.

*854 Rule 1.4(b) has a slightly different focus, specifically the client's right to participate, as set forth in Rule 1.2(a). Since the client has the right to make strategic decisions, he must be given the information necessary for informed decision making.
1 Geoffrey C. Hazard, Jr. & W. William Hodes, The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct § 1.4:101, at 83 (2d ed. Supp. 1991).
A review of the record demonstrates that Halverson clearly complied with the directive of RPC 1.4(b). Before becoming involved with his client, Halverson advised her against rushing into any new relationships and informed her that doing so could jeopardize her position in the dissolution. Report of Proceedings (RP) at 321-22. Halverson "talked about the ethical part of getting involved with a client," RP at 328, and told his client he should not begin a sexual relationship with her. RP at 329-30. And Halverson also advised his client to tell the truth if ever asked about their relationship. RP at 527. This evidence demonstrates Halverson did in fact provide his client with sufficient information to facilitate her informed decision making. Accordingly, I would affirm the hearing officer's conclusion Halverson did not violate RPC 1.4(b).

RPC 2.1  Duty to Exercise Independent Professional Judgment
The majority also finds Halverson did not exercise independent professional judgment in violation of RPC 2.1.[5] The majority concludes Halverson failed to: (1) advise his client of the potential ramifications the affair might have on the dissolution or his ability to represent her; (2) advise her of his published professional opinion that persons involved in a dissolution should not begin a new relationship; and (3) take precautions to avoid pregnancy or discuss the consequences of such event.[6] Majority at 841.
ABA Formal Opinion 92-364 carefully delineates how a sexual relationship can violate RPC 2.1:
The lawyer must evaluate the client's situation, objectively and reasonably, fairly considering all possible courses of action.
It can be difficult, however, to separate sound judgment from the emotion or bias that may result from a sexual relationship. A lawyer involved in a sexual and emotional relationship with a client may encounter particular difficulty in providing "the straightforward advice" which "often involves unpleasant facts and alternatives that a client may be disinclined to confront." Rule 2.1 comment. Because of a desire to preserve the relationship, the lawyer may "be deterred from giving candid advice by the prospect that the advice will be unpalatable to the client." Id. Thus, a lawyer who engages in a sexual relationship with a client during the course of representation risks losing the objectivity and reasonableness that form the basis of the lawyer's independent professional judgment.
ABA Comm. on Ethics and Professional Responsibility Formal Op. 92-364, at 7 (1992) (emphasis added). The ABA opinion thus simply describes the risks of an attorney-client sexual relationship and cautions that such relationships "may" violate professional obligations. But as Charles Wiggins explains in his dissent:
There is no evidence that Halverson was deterred from giving or failed to give Wickersham "straightforward advice" or candid advice "unpalatable to the client." Nor is there any evidence that Halverson could not render or failed to render independent professional judgment.
Wiggins Dissent at 10. In fact, the evidence is to the contrary. As previously discussed, Halverson advised his client against any sexual relationship, explained that a relationship with him would be improper, and *855 instructed her to tell the truth if asked about their relationship. More fundamentally, there is no showing his advice regarding the substance of the litigation was unsound. Charles Wiggins asked of the Board: "What independent professional judgment did he fail to exercise? What candid advice did he fail to give?" Wiggins Dissent at 8. Like the Board, the majority has not satisfactorily answered these questions. Accordingly, I would hold Halverson's alleged violation of RPC 2.1 has not been established by clear and convincing evidence.

Sanction
The majority concludes that because "Halverson acted knowingly, the Board properly concluded that suspension should be the presumed sanction, as opposed to disbarment or a mere reprimand." Majority at 844. However, the majority's conclusion Halverson acted "knowingly" is inconsistent with its earlier analysis.
The majority concludes Halverson violated RPC 1.7(b) (conflict of interest) for the following reasons:
Halverson should have known that discovery of the affair could worsen the relationship between Wickersham and Sarles and, thus, unnecessarily complicate the dissolution proceeding. Further, Halverson should have known that the affair could impact the custody determination of Wickersham's daughter. Finally, Halverson should have known that discovery of the affair by his wife might lead to his withdrawal as Wickersham's attorney. Thus, Halverson's subjective belief that the relationship would not adversely affect the representation was not objectively reasonable.
Majority at 840 (emphasis added). Nevertheless, the majority concludes
the evidence clearly establishes that Halverson was aware that his entry into a sexual relationship with Wickersham during her dissolution proceedings exposed her to serious psychological and legal risks.
Majority at 844 (emphasis added). I disagree. The hearing officer made no such findings. Rather, the hearing officer found:
32. Respondent knew or should have known from his sexual relationships with other clients in the past that by engaging in sexual relationships with clients, those clients were being exposed to greater risks of emotional harm. Further, Respondent should have known that his sexual relationships with clients created greater legal risks for his clients in their pending dissolution proceeding.
Findings of Fact, Conclusions of Law and Order for Further Hearing, supra, at 8 (emphasis added). This language that Halverson "should have known"used by both the hearing officer and the majority opinion in describing Halverson's violation of RPC 1.7(b)indicates that Halverson was simply negligent in determining the representation of his client would not be materially limited by his own interests. The following is the applicable ABA standard to determine Halverson's presumed sanction:
Reprimand is generally appropriate when a lawyer is negligent in determining whether the representation of a client may be materially affected by the lawyer's own interests, or whether the representation will adversely affect another client, and causes injury or potential injury to a client.
ABA Standards for Imposing Lawyer Sanctions Std. 4.33 (1991 ed.). The ABA Standards define "negligence" as "the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." ABA Standards, Definitions at 7. The majority reasons that "Halverson's subjective belief that the relationship would not adversely affect the representation was not objectively reasonable." Majority at 840. If we use that reasoning, it is clear Halverson acted negligently, not knowingly. Thus, a reprimand should be the presumed sanction for Halverson's misconduct.
Aggravating and mitigating factors may be considered to determine whether such factors warrant an alteration of the presumed sanction. In re Disciplinary Proceeding Against Johnson, 118 Wash.2d 693, *856 701, 826 P.2d 186 (1992). But although the majority finds that the Board properly considered the relevant aggravating and mitigating factors, the majority holds "we do not agree that an approximately equal number of aggravating and mitigating factors necessarily warrants a minimal suspension." Majority at 846. The majority's logic ignores binding precedent and demonstrates its desire to punish Halversonan improper purpose of disciplinary sanctions.
In In re Disciplinary Proceeding Against Haskell, 136 Wash.2d 300, 962 P.2d 813 (1998), we departed from the presumptive sanction of disbarment and imposed a sanction of suspension, despite equal aggravating and mitigating factors. "In reaching this determination, we have been little-influenced by mitigating and aggravating factors which essentially cancel each other out." Id. at 321, 962 P.2d 813. The majority ignores this precedent and fails to cite any authority for the proposition that "an approximately equal number of aggravating and mitigating factors" warrants an upward departure from a presumptive sanction. This illustrates the "majority's decision appears more an attempt to punish Halverson than to follow our disciplinary standards." Concurrence/dissent at 849 (Johnson, J.).[7]

Conclusion
No one disputes that Lowell Halverson acted wrongly, foolishly, and hurtfully when he entered into a sexual relationship with Lisa Wickersham. It was a grievous wrong and grievously has Halverson answered for it. The task before this [court], however, is not to pass moral judgment on Halverson, but to determine whether he violated any of the Rules of Professional Conduct, and if so, the appropriate sanction to protect the public and to deter future wrongdoing by Halverson and others.
Wiggins Dissent at 1. Although Halverson's conduct arguably violated RPC 1.7(b), it did not violate RPC 1.4(b) or RPC 2.1. And as both the hearing officer and the majority acknowledge Halverson "should have known" better, the appropriate sanction under these circumstances is a reprimand.
NOTES
[1] Finding of Fact 28 states:

Ms. Wickersham depended on Respondent while he was her attorney to help her obtain temporary living arrangements, custody of her child with sufficient child support and maintenance. She also depended upon Respondent for a favorable property settlement which was important for her economic well being. This dependence created a large power imbalance between Ms. Wickersham and Respondent.
Clerks Papers (CP) at 673.
[2] Finding of Fact 33 states:

In the instant case, Ms. Wickersham has suffered personal harm from Respondent's conduct. In addition, Ms. Wickersham was harmed by having to change attorneys during the dissolution proceeding. The change of attorneys required additional time on the part of Ms. Wickersham. It required her to establish a new relationship with another attorney. Further, Ms. Wickersham suffered a temporal [sic] inability to focus on her dissolution after the relationship with Respondent ended which made the dissolution more difficult for Ms. Wickersham and her new attorney.
CP at 674.
[3] Finding of Fact 29 states:

Unlike many legal areas, dissolution practice requires some degree of intimacy between lawyer and client. Attorneys practicing dissolution law are not only attorneys but to some extent are personal counselors or quasi therapists. Respondent enhanced this feeling on the part of dissolution clients, both through his administration of a personality sorter and through the personal advice in his book.
CP at 673.
[4] Finding of Fact 32 states:

Respondent knew or should have known from his sexual relationships with other clients in the past that by engaging in sexual relationships with clients, those clients were being exposed to greater risks of emotional harm. Further, Respondent should have known that his sexual relationships with clients created greater legal risks for his clients in their pending dissolution proceeding[s].
CP 674.
[5] Lowell K. Halverson & John W. Kydd, Divorce in Washington: A Humane Approach (1985).
[6] Washington State Bar Ass'n, Family Law Deskbook § 3.9 (1989).
[7] RPC 1.7(b) provides:

A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
(1) The lawyer reasonably believes the representation will not be adversely affected; and
(2) The client consents in writing after consultation and a full disclosure of the material facts (following authorization from the other client to make such a disclosure). When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.
[8] Justice Sanders' concurrence/dissent argues that we incorrectly affirm the Board's ruling regarding RPC 1.4(b) because, among other reasons, the Board improperly "ignore[d] the examiner's findings and replace[d] those with new ones based on previously considered evidence." Dissent at 853 (citing In re Disciplinary Proceeding Against Lynch, 114 Wash.2d 598, 608, 789 P.2d 752 (1990)). This is a misreading of Lynch. See 114 Wash.2d at 607-08, 789 P.2d 752 (RLD 6.7(d) "specifically grants the Board authority to adopt, modify or reverse findings, conclusions, or recommendations of the hearing officer."); accord In re Disciplinary Proceeding Against Heard, 136 Wash.2d 405, 413-14, 963 P.2d 818 (1998) (Board's modified findings of fact upheld because they were "amply supported by the record" (citing, inter alia, RLD 6.7(e) and In re Lynch, 114 Wash.2d at 607-08, 789 P.2d 752)). Here, the Board's decision was completely proper as it was based upon reasonable inferences drawn from the examiner's findings of fact and is amply supported by the record. See CP at 355 (Halverson failed to discuss potential complicating effects of affair on dissolution or custody proceedings); accord RP at 511-15 (Halverson's testimony on direct); RP at 628-29 (Halverson's testimony on cross).
[9] Halverson notes that Haley is distinguishable because it involved a bright line statutory rule prohibiting physician-patient sexual contact. See RCW 18.130.180(24). Although this statute does create a bright line rule, the Haley court held it inapplicable because the young woman was a former patient. 117 Wash.2d at 730-31, 818 P.2d 1062.
[10] In this section of our opinion, we assume the hearing officer must apply the same standards as the Board, but refer only to the Board.
[11] Mitigating factors include:

(a) absence of a prior disciplinary record; (b) absence of a dishonest or selfish motive; (c) personal or emotional problems; (d) timely good faith effort to make restitution or to rectify consequences of misconduct; (e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (f) inexperience in the practice of law; (g) character or reputation; (h) physical disability; (i) mental disability or chemical dependency including alcoholism or drug abuse ...; (j) delay in disciplinary proceedings; (k) imposition of other penalties or sanctions; (l) remorse; (m) remoteness of prior offenses.
ABA Standards Std. 9.32(1991 ed. & Feb. 1992 Supp.). Aggravating factors include:
(a) prior disciplinary offenses; (b) dishonest or selfish motive; (c) a pattern of misconduct; (d) multiple offenses; (e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency; (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process; (g) refusal to acknowledge wrongful nature of conduct; (h) vulnerability of victim; (i) substantial experience in the practice of law; (j) indifference to making restitution; (k) illegal conduct including voluntary use of controlled dangerous substances.
ABA Standards Std. 9.22 (1991 ed. & Feb. 1992 Supp.).
[12] Compare ABA Standards Std. 4.33 (reprimand is presumed sanction for lawyer's negligence regarding conflict of interest), Std. 4.31(b) (disbarment is presumed sanction when lawyer intends to benefit himself in conflicted representation), and Std. 7.3 (reprimand is generally appropriate for negligent violation of a duty to the legal profession).
[13] We acknowledge that in some cases decided before 1986 this Court approved of suspensions less than six months without articulating specific mitigating circumstances, but we note that such cases were decided before the ABA Joint Committee on Professional Standards prepared the ABA Standards and before this Court first officially adopted such standards for use in all lawyer discipline cases. See Lynch, 114 Wash.2d at 610, 789 P.2d 752.
[14] We note that the record supports consideration of additional factors not explicitly relied upon by the Board, for example, selfish motive as an aggravating factor and a good faith effort to rectify at least some of the consequences of the misconduct as a mitigating factor. We do not believe, however, that these additional factors would have changed the Board's ultimate conclusion that the aggravating and mitigating factors cancelled each other out.
[15] See Curran, 115 Wash.2d at 774, 801 P.2d 962 (a lawyer's excellent professional reputation is not a proper mitigating factor when the lawyer's misconduct is not directly related to professional activity (citing In re Disciplinary Proceeding Against McGrath, 98 Wash.2d 337, 344-45, 655 P.2d 232 (1982))).
[16] In so stating, we do not mean to suggest that the ABA Standards require a specific sanction for any particular lawyer misconduct. In fact, quite the opposite is true. The background section of the ABA Standards states: "[T]he Sanctions Committee recognized that any proposed standards should serve as a model which sets forth a comprehensive system of sanctions, but which leaves room for flexibility and creativity in assigning sanctions in particular cases of lawyer misconduct." ABA Standards, Preface at 1. The methodology section further states: "[O]ne will look in vain for a section of this report which recommends a specific sanction for, say, improper contact with opposing parties who are represented by counsel ..., or any other specific misconduct." ABA Standards, Preface at 3. Finally, the theoretical framework section states: "The standards thus are not analogous to criminal determinate sentences, but are guidelines which give courts the flexibility to select the appropriate sanction in each particular case of lawyer misconduct." ABA Standards, Theoretical Framework at 6.
[17] In the following cases, this Court increased the Board's recommended sanction finding it inadequate to serve the purposes of attorney discipline or disproportionate to sanctions imposed for similar misconduct: In re Discipline of Petersen, 120 Wash.2d 833, 846 P.2d 1330 (1993) (Board recommended 2-year suspension; this Court ordered disbarment); In re Disciplinary of McGough, 115 Wash.2d 1, 793 P.2d 430 (1990) (Board recommended 2-year suspension; this Court ordered disbarment); In re Disciplinary of Johnson, 114 Wash.2d 737, 790 P.2d 1227 (1990) (Board recommended 1-year suspension; this Court ordered disbarment); Lynch, 114 Wash.2d at 612, 789 P.2d 752 (Board recommended 6-month suspension; this Court ordered 2-year suspension); Felice, 112 Wash.2d 520, 772 P.2d 505 (Board recommended letter of censure; this Court ordered a 30-day suspension); In re Disciplinary of Yates, 110 Wash.2d 444, 755 P.2d 770 (1988) (Board recommended 2-year suspension; this Court ordered disbarment); In re Disciplinary of Selden, 107 Wash.2d 246, 728 P.2d 1036 (1986) (Board recommended 60-day suspension; this Court ordered disbarment).
[18] We do not consider sanctions imposed in sexual misconduct cases from other jurisdictions because the range of such sanctions in relation to the misconduct is highly inconsistent. Compare, e.g., In re Lewis, 262 Ga. 37, 415 S.E.2d 173 (1992) (three year suspension imposed where attorney commenced sexual relationship three years before being retained in divorce action even though no harm to client appeared to have resulted) with In re McBratney, 320 S.C. 416, 465 S.E.2d 733 (1996) (90-day suspension imposed where attorney gave domestic relations client one-half of a Valium, and had sexual relationship with her, and legal representation resulted in a less than favorable settlement).
[19] See Selden, 107 Wash.2d 246, 728 P.2d 1036 (ordering disbarment although no member of the Board recommended more than a 120-day suspension).
[1] In Noble, this court developed its current standard of review of Board attorney discipline decisions. Noble, 100 Wash.2d at 95-96, 667 P.2d 608. Since Noble, the majority of cases have either chosen to follow the Board's recommended sanction or impose a lesser sanction. See, e.g., In re Disciplinary Proceeding Against Heard, 136 Wash.2d 405, 425, 963 P.2d 818 (1998) (adopting recommended two-year suspension); In re Disciplinary Proceeding Against Dann, 136 Wash.2d 67, 87, 960 P.2d 416 (1998) (adopting recommended one-year suspension); In re Disciplinary Proceeding Against McLendon, 120 Wash.2d 761, 775, 845 P.2d 1006 (1993) (adopting recommendation of Board dissenters to issue one-year suspension rather than disbarment suggested by Board majority); In re Disciplinary Proceeding Against Johnson, 118 Wash.2d 693, 705, 826 P.2d 186 (1992) (adopting sanction between 60 days [suggested by Board dissenters] and six months [suggested by Board majority]); In re Disciplinary Proceeding Against Hankin, 116 Wash.2d 293, 310, 804 P.2d 30 (1991) (adopting recommended one-year suspension); In re Disciplinary Proceeding Against Allotta, 109 Wash.2d 787, 796, 748 P.2d 628 (1988) (adopting recommended sanction of disbarment); In re Disciplinary Proceeding Against Rentel, 107 Wash.2d 276, 289, 729 P.2d 615 (1986) (adopting recommended sanction of disbarment); Noble, 100 Wash.2d at 98, 667 P.2d 608 (adopting recommended three-month suspension). In other cases where this court has increased the recommended sanction, this decision has frequently followed the recommendation of the hearing examiner or the dissenting members of the Board. E.g., In re Disciplinary Proceeding Against McGough, 115 Wash.2d 1, 8, 793 P.2d 430 (1990) (adopting recommendation of three dissenting board members); In re Disciplinary Proceeding Against Lynch, 114 Wash.2d 598, 603, 789 P.2d 752 (1990) (adopting recommendation of four dissenting board members); In re Disciplinary Proceeding Against Felice, 112 Wash.2d 520, 528, 772 P.2d 505 (1989) (adopting hearing examiner's recommended 30-day suspension); In re Disciplinary Proceeding Against Yates, 110 Wash.2d 444, 448-49, 755 P.2d 770 (1988) (adopting hearing examiner's recommended sanction of disbarment). Thus, although this court is unquestionably the final authority on attorney discipline in this state, these cases illustrate that our standard of review is designed to provide an objective basis for the evaluation of the conclusions reached below, thus avoiding ad hoc determinations of sanctions. See Noble, 100 Wash.2d at 94, 667 P.2d 608.
[2] While the case of "Jane Doe E" was to be considered during the proceedings, Ms. E consistently refused to comply with subpoenas and never offered testimony.
[3] Heard, 136 Wash.2d 405, 963 P.2d 818, is distinguishable for the obvious reasons set forth by the majority.
[4] See, e.g., In the Disciplinary Proceedings Against Lowell Halverson, No. 1518 (WSBA Disciplinary Bd. Order Sept. 30, 1998); Clerk's Papers at 863-66, 864 n. 5 (discussing court declining to adopt per se rule prohibiting attorney-client sexual relations); Clerk's Papers at 891 (Wiggins, J., dissenting) (encouraging court to adopt per se rule); Clerk's Papers at 894 (Kilpatrick, J., concurring) (discussing uncertainty surrounding court's treatment of proposed per se rule and application of existing rules).
[1] Counsel for the WSBA perpetuates this outdated stereotype, arguing: "Mr. Halverson was a very prominent, successful, powerful lawyer, a President of the Bar Association. Ms. Wickersham was a much younger, a woman without a college degree, with a young child, who was intimidated by her attorney husband, and who was terrified of losing custody of her baby daughter." Disciplinary Counsel's Resp. Br. at 14.
[2] Not only did Halverson settle his client's civil suit for an undisclosed "substantial sum of money, Halverson provided his client with over $13,000 of free legal workdescribed by Wickersham's second attorney as work of "excellent" qualitywhich greatly aided Halverson's client in obtaining a good outcome. Report of Proceedings at 574-76.
[3] By the same token Halverson has no doubt sustained severe emotional distress which might have cost him his marriage but for the grace of his wife.
[4] RPC 1.4(b) provides: "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."
[5] RPC 2.1 provides:

In representing a client, a lawyer shall exercise independent professional judgment and render candid advice. In rendering advice, a lawyer may refer not only to law but to other considerations such as moral, economic, social and political factors, that may be relevant to the client's situation.
[6] I would hardly impose a professional duty upon an attorney to tell an adult mother that intercourse may result in conception.
[7] In doubling the Board's recommended sanction, the majority finds relevant that Halverson's personal conduct contradicted his published professional advice and considered his "status in the legal community" of particular importance. Majority at 847. The practical result of the majority's logic is that lawyers may now be sanctioned for personal conduct falling below their own personal standards, although not necessarily below the standards for professional discipline set by this court by rule. Further, attaching relevance to a lawyer's status punishes lawyers for becoming active in the legal community and encourages the Bar to target "high profile" attorneys for discipline to make an example of those who have risen to the top of their profession through exemplary service to their clients. If anything, these factors should be considered in mitigation of a sanction, not aggravation.