[No. 13294-1. En Banc.]

Argued November 7, 2002. Decided March 6, 2003.

*In the Matter of the Disciplinary Proceeding Against* JOHN L. MCKEAN, *an Attorney at Law.*

852

*John L. McKean*, pro se.
*Douglas J. Ende*, for the Bar Association.

JOHNSON, J. — In this case we review the Washington State Bar Association (WSBA) Disciplinary Board's (Board) recommendation that John L. McKean be suspended from the practice of law for six months followed by six months of probation. The recommendation was based on McKean's entering into a business arrangement with a client to shield the client from creditors, financing the business with funds borrowed from the lawyer's trust account, and using the lawyer's trust account for his own business purposes. We adopt the Board's findings of fact and conclusions and affirm McKean's six month suspension and probation.

## FACTUAL AND PROCEDURAL HISTORY

McKean was admitted to the bar on May 2, 1983. Decision Papers (DP) at 5. He has a sole general practice in Moses Lake, Washington. On January 13, 1997, McKean began to represent James Dean Martin and Wendy Dawn Martin (Martins). The Martins were farmers in financial

trouble. McKean prepared and filed a Chapter 12[1] farm bankruptcy petition for the Martins in the United States Bankruptcy Court for the Eastern District of Washington. Coincident to the bankruptcy, the court issued an automatic stay order of all past, present, and future proceedings. The Martins were required to report all cash receipts and disbursements each month and could not hire a lawyer unless authorized by the bankruptcy court.

In July 1997, McKean learned the Martins had not been filing the required monthly financial reports with the bankruptcy court and believed the bankruptcy would be dismissed involuntarily as a result. McKean advised the Martins to voluntarily dismiss the bankruptcy and to form a corporation, American Hay Company (the Company), to shield them from their creditors. McKean had experience farming, and the Martins asked for his help in managing their farming business. They also asked McKean for financial assistance. McKean agreed to help the Martins manage and finance their farming enterprise through joint ownership of the Company. On July 7, McKean wrote the Martins a $500 check from his trust account, and McKean testified that he and the Martins orally agreed to form the Company together on this date.[2]

On July 14, McKean issued two more checks for the benefit of the Company from his trust account. One check was for $1,560; the other was for $8,868.25. On July 30, McKean wrote a check for $700 cash. The total amount McKean withdrew from his trust account for the benefit of the Company was $11,628.25.

Shortly after July 14, McKean began to hear of the Martins' prior dishonest business practices. Regardless, on July 17, McKean filed articles of incorporation for the company with the secretary of state. The articles identified

---

[1] Chapter 12 bankruptcy is specific to farmers and is roughly equivalent to Chapter 11 bankruptcy. Report of Proceedings at 173 (testimony of Mary Ellen Gaffney-Brown, bankruptcy attorney).

[2] The Martins did not testify at McKean's disciplinary hearing.

McKean as the incorporator and the initial registered agent. McKean's office was the registered place of business.

The written agreement to form the Company was not drafted until a month later.[3] Report of Proceedings (RP) at 24. On August 11, McKean and the Martins signed a document entitled "Agreement Re: Formation and Operation of American Hay Company" (the Agreement). DP at 8; Ex. 3. McKean testified that the Agreement reflected the understanding he orally made with Martin. It provided that McKean was to retain 51 percent ownership and the Martins 49 percent ownership of the Company. McKean testified his 51 percent was to be held in trust for the Martins, but there is no documentation to that effect. McKean testified the purpose of his majority ownership in the company was to ensure that he had some security for his loans and that the Company's financial obligations, including payroll and taxes, would be met.

The Agreement also stated

> [the Martins] understand that McKean is under obligation to not take advantage of his position as their attorney. They further understand that they have the right and opportunity to have this agreement reviewed by another attorney or by anyone of their choosing to determine if it is fair and in their best interest.

Ex. 3.

The ownership of the funds issued from McKean's trust account is somewhat confused. Initially, McKean's bookkeeper debited this $11,628.25 from the ledger of another client for whom he held funds—DiPaula.[4] In the fall of

---

[3] McKean backdated the document to July 17, but there are no allegations or evidence that McKean benefited or that the Martins suffered as a result of the backdating.

[4] McKean had earlier received a $45,000 verdict for DiPaula and held that amount in trust. During a deposition in McKean's disciplinary proceeding, McKean's lawyer testified McKean believed the two checks he wrote for the benefit of the Company on July 14 were part of his fee for DiPaula's verdict. Then, during the hearing, McKean disavowed this version, claiming the debits from the DiPaula account were merely a bookkeeping error, which he later corrected by debiting them from the Bergman estate (explained below).

1997, McKean instructed his bookkeeper to instead debit the loans from another client's ledger—that of the Bergman estate. McKean maintains he had authority as personal representative of that estate to loan the money from the Bergman estate to the Company as part of his nonintervention powers. These amounts were to be short-term loans and to carry 12 percent interest. He did not notify either the Bergman estate heirs or DiPaula of these transactions. McKean also did not prepare or have executed any documents evidencing the loans or terms of repayment, or provide security.

After the Martins received financial help from McKean, they refused to dismiss the bankruptcy. Because of the ongoing bankruptcy, McKean did not perfect the corporation. McKean testified there were no officers, bylaws, or bank accounts. Nevertheless, the hearing examiner found McKean treated the Company as a separate entity throughout the relevant time period. McKean personally guaranteed many of the Company's financial obligations and continued to pay its expenses. *E.g.*, RP at 45.

The hearing examiner concluded that "[a]t the time the $11,128.25 loans to Martin were made, [McKean] knew or could, with minimal effort, have known that Jim Martin had a very poor reputation and financial record." DP at 10. For example, the Martins were previously sued in bankruptcy court for double selling silage for $185,000. The Martins also had filed a prior Chapter 12 bankruptcy about eight months before McKean's involvement, which was dismissed for failure to file monthly reports. Furthermore, McKean testified he believed the Martins lied to him about dismissing the current bankruptcy in order to receive money from McKean.

Despite this knowledge of the Martins' untrustworthiness, McKean did not withdraw from the business with them. Instead, McKean believed he had to continue his role in the Company to protect his financial investment in the Martins' farming enterprise. In August 1997, McKean received $10,000 on behalf of the Company and deposited it in

his trust account under the Company's ledger balance. He issued seven checks debited from the Company's ledger in his trust account totaling $9,500. One of these was a check to McKean Law Office for $5,000, which was reimbursement for expenses he paid for the benefit of the Company. McKean admitted during his hearing, however, that he was owed only $4,180.98. He thus overpaid himself $819.02. In addition, McKean still owed the Bergman estate $11,128.25 plus interest for the previous loans to the Martins.

In November 1997, McKean realized that neither the Martins nor the Company would be able to repay the trust account funds McKean lent to them. As a result, he borrowed approximately $23,000 and paid off the Company's expenses and reimbursed the Bergman estate funds with interest.

The Martins dismissed McKean and hired another bankruptcy attorney on August 20, 1997. The Martins' new attorney and bankruptcy trustee became aware of McKean's activity in forming the Company and alerted the WSBA, which ordered an audit of McKean's books.

In November 1999, an auditor from the WSBA audited McKean's trust account. The auditor discovered McKean's bookkeeping in disarray. There were errors and changed entries. Some of the deficiencies included writing checks before the funds to cover them were deposited in the account (McKean testified the checks never were disbursed until the funds were deposited in the account); carrying negative ledger balances of $323.32 from July 1, 1996 to September 12, 1996; $262.47 on May 29, 1998; and $310.06 between July 30 and August 1, 1997. On his own initiative, McKean has turned management of his trust account over to another attorney.

Unrelated to his representation of the Martins, McKean used his trust account as his firm's general business account for approximately two weeks in September 1996. McKean does not dispute this but contends this period was shorter than two weeks. Lawyer's Br. at 22; RP at 402.

## COMPLAINT

The WSBA filed a three-count complaint against McKean. Count I charged that McKean's "conduct in failing to preserve the integrity of client funds and/or Respondent's use and/or conversion of client funds without the proper authority and/or consent violates RPC 1.14 (requires lawyer to preserve the integrity of client funds) and/or RPC 8.4(c) (engaging in deceitful conduct), and subjects Respondent to discipline pursuant to RLD 1.1(i)." Clerk's Papers (CP) at 31.

Count II charged that McKean's "conduct in disobeying the obligations under the Bankruptcy Code sections 363 and 364 in connection with the formation and operation of American Hay violated RPC 3.4(c) (disobeying an obligation under the rules of a tribunal) and/or RPC 8.4(c) (engaging in deceitful conduct), and subjects Respondent to discipline pursuant to RLD 1.1(i)." CP at 32.

Count III charged that McKean's "conduct in engaging in business transactions with the Martins during the period that he represented them violated RPC 1.8(a) (conflict of interest) and/or RPC 1.8(e) (advancing funds to a client during the period that the lawyer represents the client) and/or RPC 1.8(j) (prohibits a lawyer from acquiring a proprietary interest in the subject matter of litigation) and/or 1.7(b) (conflict of interest rules), and subjects Respondents to discipline pursuant to RLD 1.1(i)." CP at 32.

## HEARING EXAMINER'S CONCLUSIONS AND RECOMMENDATIONS

After a disciplinary hearing, the hearing examiner concluded McKean dealt improperly with client funds by making the loans to the Martins and the Company, in violation of RPC 1.14. The hearing examiner concluded that McKean knew or should have known he was "dealing improperly with other clients' money" when he loaned the $11,628.25 to "a debt ridden, uncreditworthy client without any documentation or due diligence." DP at 11.

The hearing examiner further found bookkeeping irregularities, which compounded the violation of RPC 1.14:

The posting of deposits and disbursements within the trust account was inaccurate. Credits and debits within sub-accounts were riddled with errors. There is no proof that the trust account had a negative bank balance (as distinguished from a ledger balance) or that a client failed to receive his or her funds. * * * The noted deficiencies evidence that the maintenance of the trust account was slipshod and erratic. The deficiencies were not deliberate but rather the result of poor trust account procedures and lack of oversight, for which Respondent accepts responsibility.

DP at 14.

The hearing examiner also concluded McKean violated RPC 1.8(a) when he impermissibly engaged in a business with the Martins by acquiring an interest adverse to theirs and not making a full disclosure of the conflict of interest. In particular, the hearing examiner stated McKean "did not sufficiently inform the Martins of the risks inherent in having their attorney as a business associate. The agreement is not specific about the disadvantages of such a relationship." DP at 9. This lack of detail would not have allowed an independent attorney reviewing the agreement to give the Martins meaningful advice, "thus depriving the Martins of making an informed consent." DP at 9.

The hearing examiner dismissed charges in Count II relating to violations of the bankruptcy code and all other charges.[5] The hearing examiner recommended McKean's suspension from the practice of law for one year. Upon completion of the suspension, the examiner recommended six months' probation, on the condition McKean not practice law until he demonstrates a familiarity in managing trust

---

[5] The dismissed charges include engaging in fraudulent or deceitful conduct (RPC 8.4(c)); giving financial assistance to a client in connection with pending litigation (RPC 1.8(e)); acquiring a proprietary interest in a current client's cause of action or litigation (RPC 1.8(j)); and representing a client when representation is materially limited by the lawyer's responsibilities to another client, third person, or the lawyer himself (RPC 1.7(b)). DP at 22-23.

accounts and completes 10 hours of continuing legal education credits on conflicts of interest.

The Board adopted the hearing examiner's findings and conclusions. By a vote of seven to three, the Board reduced McKean's suspension recommendation from one year to six months, followed by six months of probation with the conditions recommended by the hearing examiner. The dissenters would have adopted the hearing examiner's recommended one-year suspension.

## ANALYSIS

We have plenary authority over, and hold the ultimate responsibility for, determining the nature of lawyer discipline. *In re Disciplinary Proceeding Against Tasker*, 141 Wn.2d 557, 565, 9 P.3d 822 (2000). We have, however, delegated certain responsibilities to the WSBA. *In re Disciplinary Proceeding Against Heard*, 136 Wn.2d 405, 413-14, 963 P.2d 818 (1998). A hearing examiner makes findings of fact, conclusions, and initial recommendations to the Board. *Heard*, 136 Wn.2d at 413-14. The Board reviews the hearing examiner's decision and enters its order, which can then be appealed to us. *Heard*, 136 Wn.2d at 414.

## CHALLENGES TO THE FINDINGS OF FACT

■ Initially, McKean challenges seven findings of fact. Lawyer's Br. at 18-22. When unanimously approved findings are challenged, as they are here, this court will generally not disturb them if they are supported by a clear preponderance of the evidence. RLD 4.11(b);[6] *In re Disciplinary Proceeding Against Halverson*, 140 Wn.2d 475, 483, 998 P.2d 833 (2000). McKean does not truly challenge the evidentiary support for the findings to which he objects. Instead he reargues explanations and versions of the facts rejected by the hearing examiner. Lawyer's Br. at 20-25.

---

[6] This court recently adopted the Rules for Enforcement of Lawyer Conduct (ELCs), which supplanted the Rules for Lawyer Discipline (RLDs). The ELCs did not take effect until October 1, 2002. Because McKean's misconduct took place before this date, this opinion will apply the RLDs.

McKean first assigns error to two findings which state he made loans from his trust fund without the owners' permission or documentation.[7] McKean does not dispute that he made undocumented loans to the Martins or that the money came from his trust account. Instead, he argues that the loans to the Company were never debited from the DiPaula account.[8] Yet, McKean admitted that his secretary initially debited the DiPaula account because she assumed the checks he wrote the Martins were part of his fees from a settlement check he had recently received on behalf of DiPaula. He also conceded that he allowed his former lawyer to argue during a prior hearing in bankruptcy court that McKean intended the money to come from his share of a client's settlement check. Then, when pressed during his disciplinary hearing on whether he ever intended to use DiPaula funds for the Company, McKean disavowed his lawyer's prior statement, claiming, "[t]hat was not my answer. That was my attorney's answer." RP at 47. This factual challenge is therefore without merit and of questionable relevance to whether McKean mismanaged client funds.

In his fourth assignment of error, McKean contests the finding that he overpaid himself by $819.02. Lawyer's Br. at 21. Again, he does not show this is unsupported by a clear preponderance of the evidence.

McKean's fifth, sixth, and seventh assignments of error challenge findings of accounting discrepancies in McKean's trust account ledger. Lawyer's Br. at 22-23. McKean con-

---

[7] He challenges the finding that " '[o]n July 7, 1997, Respondent loaned Jim Martin $500.00 from his attorney's trust account without any documentation as to the terms or conditions, and without obtaining permission from the owner of the funds.' " Lawyer's Br. at 20 (quoting DP at 7). McKean also challenges the finding " '[w]ithout seeking authority from the owners of the money, Respondent, as loans to the Martins, issued the following checks from his attorney's trust account to or for the benefit of the Martins or American Hay Company.' " Lawyer's Br. at 20 (quoting DP at 9).

[8] The finding in question states: " 'Respondent's bookkeeper initially recorded these disbursements as debits on the DiPaula ledgers until approximately the fall of 1997, when Respondent discovered that the debits should have been to the Bergman Estate ledger, and instructed his bookkeeper to do so.' " Lawyer's Br. at 20 (quoting DP at 10).

tends the auditor looked only at copies of the ledger and did not examine canceled checks. Revised Reply Br. at 5. He further argues the hearing examiner took the findings from the auditor's report without exercising independent judgment. This argument is belied by the fact that the hearing examiner did not believe the auditor's testimony that she had been provided only with photocopies. The examiner found "[t]he auditor filed a written report dated November 30, 1999 in which there is no mention of being given photocopies . . . ." DP at 13. The record indicates the hearing examiner exercised independent judgment regarding the auditor's report; therefore this argument fails.

██ Because the hearing examiner has fact-finding authority, we defer to those findings of fact unless they are not supported by a clear preponderance of the evidence. RLD 4.11(b). Because our review of the record confirms the unanimously adopted findings are supported by the evidence, we reject McKean's challenges.

## RPC 1.14—LOANS FROM MCKEAN'S TRUST ACCOUNT

██ The most serious charge against McKean involves the loans he made from his trust account to American Hay Company. The complaint alleged this violated RPC 1.14, and the hearing examiner and Board agreed.

RPC 1.14 provides the minimum requirements for a lawyer's fiduciary responsibility when handling clients' funds and property. *See generally* RPC 1.14; *see also* RPC Preliminary Statement. For example, RPC 1.14 requires a lawyer, inter alia, to deposit clients' funds in a trust account, separate from the lawyer's own funds. RPC 1.14(a). The rule also requires a lawyer to provide the client with documentation for the receipt of the funds and to "[m]aintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his or her client regarding them . . . ." RPC 1.14(b)(1), (3).

RPC 1.14, however, also encompasses a duty of care beyond these minimum standards. As several commentators on professional responsibility have recognized,[9] " '[a]n attorney who accepts the responsibility of a fiduciary nature is held to the high standards of the legal profession whether or not he acts in his capacity of an attorney.' " ANNOTATED MODEL RULES OF PROF'L CONDUCT, 230-31 (Center for Professional Responsibility, American Bar Association, 4th ed. 1999) (discussing model rule 1.15 and quoting *Ridge v. State Bar*, 47 Cal. 3d 952, 766 P.2d 569, 574, 254 Cal. Rptr. 803 (1989)). "Lawyers sometimes forget that the dangers of commingling are not merely that the lawyer will squander the money 'borrowed' from a trust account and not be able to restore it, but that the commingled funds might be subject to attachment by a lawyer's creditors, thus preempting the lawyer's ability to do so." GEOFFREY C. HAZARD, JR. & W. WILLIAM HODES, THE LAW OF LAWYERING: HANDBOOK ON THE MODEL RULES OF PROFESSIONAL CONDUCT § 19.4 (3d ed. 2001 & Supp. 2002). "Commingling and, to a lesser extent, conversion frequently result from bad bookkeeping rather than an intent to take the money." ABA/BNA LAWYER'S MANUAL ON PROFESSIONAL CONDUCT 45:303 (2002).

RPC 1.14 thus requires more than merely keeping track of or not stealing client funds. A lawyer's duty to be honest and use good professional judgment is a higher standard than merely not breaking the law. *Cf. Seventh Elect Church in Israel v. Rogers*, 102 Wn.2d 527, 534, 688 P.2d 506 (1984) (the ethics rule of attorney-client confidentiality is a higher standard than the statutory attorney-client privilege). "Lawyers are held to higher standards of moral conduct than are other citizens." *In re Disciplinary Proceeding Against Krogh*, 85 Wn.2d 462, 488, 536 P.2d 578 (1975). A lawyer's ethical duties are not merely toward his clients. A lawyer's obligation "to protect . . . property . . . and to ex-

---

[9] Although we have not officially adopted the comments to the ABA Model Rules, we look to them and other commentary when we find they are helpful in understanding the underlying policy behind the rules. *In re Disciplinary Proceeding Against Carmick*, 146 Wn.2d 582, 595, 48 P.3d 311 (2002).

hibit the highest standards of honesty and integrity" extends to the public as well as to the lawyer's clients. *In re Disciplinary Proceeding Against McGough*, 115 Wn.2d 1, 11, 793 P.2d 430 (1990).

We hold that RPC 1.14 encompasses the extreme care, caution, and good judgment required of a lawyer when handling a client's property. A lawyer has the highest fiduciary duty to steward his client's funds with the utmost care, transparency, and prudence. Although the duty not to self-deal client funds is explicitly addressed elsewhere in the Rules of Professional Conduct,[10] RPC 1.14 implicitly includes the duty not to use a lawyer's trust account as a personal bank. A lawyer thus violates RPC 1.14 by loaning money held in trust to the lawyer's own business ventures or those of the lawyer's business associates, or to other clients.

Here, McKean violated RPC 1.14 when he loaned client money held in trust to his own business venture with another client. This act alone was an ethical violation requiring the imposition of sanctions. McKean compounded the seriousness of the violation by not securing or accurately documenting the "investment" in a venture that he knew, or should have known, to be a poor business risk, and by not providing notice to those with an interest in the funds. McKean's sloppy accounting practices not only further obscured the loans to the Company, but jeopardized all of the client funds he held in trust. McKean ultimately reimbursed with interest the client funds he borrowed, but he endangered the funds entrusted to him and violated the high fiduciary duty owed his clients. We therefore affirm that McKean violated RPC 1.14 and the high standards of professional judgment and fiduciary duty that rule encompasses.

We reject McKean's assertion that he had legal authority to make the loans as personal representative of the

---

[10] *See* RPC 1.8, 1.9.

Bergman estate under RCW 11.100.020.[11] We also reject McKean's argument he did not have a duty to the heirs of the estate because they were not his clients.[12] These arguments miss the point. McKean's loans of client funds held in trust violated RPC 1.14 despite any legal authority McKean had to invest the money of the Bergman estate. *Accord In re Levingston*, 96-1379 (La. 12/6/96), 685 So. 2d 105 (making speculative and unsecured loans with trust funds to business associates and friends was grossly negligent and in reckless disregard of fiduciary duties, despite no evidence of intentional misconduct or dishonest motive).

In sum, McKean's loan of client money held in trust alone violates RPC 1.14 and requires the imposition of sanctions. McKean compounded this violation by not providing security or documentation for the loans and by his poor accounting practices. We also affirm the undisputed conclusion that McKean violated RPC 1.14 when he commingled client funds held in trust with his own money for approximately two weeks in 1996, as well as his undisputed violation of RPC 1.8(a) when he failed to adequately disclose to the Martins his conflict of interest.

## VIOLATIONS OF RPC 1.7(b) and 8.4(c)

The WSBA argues that the hearing examiner erred in dismissing the RPC 1.7(b) and 8.4(c) charges. Answering Br. of WSBA at 15-17.

 While we agree with the hearing examiner's conclusion that the WSBA failed to prove that McKean's repre-

---

[11] That statute provides that "a fiduciary shall exercise the judgment and care under the circumstances then prevailing, which persons of prudence, discretion and intelligence exercise in the management of their own affairs . . . ." RCW 11.100.020(1). The statute then lists nine factors to be considered. McKean admits he failed this standard: "Loaning money to Martin was admittedly foolish and imprudent." Lawyer's Mem. at 33.

[12] McKean was not only the lawyer, but also was the personal representative of the estate. This heightened his ethical duty. We will not address the ethically precarious territory a lawyer enters when he takes on the roles of both attorney and personal representative for an estate, but we will let it suffice to note that in order to chart such territory successfully, a lawyer must be extremely alert to potential ethical violations.

sentation of the Martins violated RPC 1.7(b), the evidence does establish that his representation of the Bergman estate violated the rule.

RPC 1.7(b) provides:

> A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
>
> (1) The lawyer reasonably believes the representation will not be adversely affected; and
>
> (2) The client consents in writing after consultation and a full disclosure of the material facts . . . .

We hold that the evidence establishes that McKean's representation of the Bergman estate may have been materially limited by his own financial interest in the Company.

McKean loaned money held in trust for the Bergman estate to the Company. Not only was the Company in financial need, but McKean held a majority interest in the Company. Furthermore, he never informed the Bergman estate's heirs that he loaned money held in trust for the estate. The hearing examiner found that he "knew or should have known he was dealing improperly with other clients['] trust money." DP at 11.

RPC 1.7(b) allows for a lawyer to represent a client when a potential conflict of interest exists only if the lawyer "reasonably believes the representation will not be adversely affected" *and* "[t]he client consents in writing after consultation and a full disclosure of the material facts . . . ." The first condition of consent is measured by whether "a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances," and if so, "the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent." ANNOTATED MODEL RULES OF PROF'L CONDUCT R. 1.7, cmt. [5] (discussing Model Rule 1.7 which is substantially similar to RPC 1.7).

It was not reasonable for McKean to believe that his representation of the Bergman estate would not be adversely affected under these circumstances. McKean loaned the estate's money, without any disclosure of the transaction to the estate, to a company in which he held a majority interest and which was in desperate need of financial support. A disinterested lawyer would conclude that the Bergman estate should not agree to the representation. Second, even if it were reasonable for McKean to believe that his interest in the Company would not adversely affect his representation of the Bergman estate, the rule requires a lawyer to receive client consent "in writing after consultation and a full disclosure of the material facts . . . ." RPC 1.7(b). McKean completely failed to disclose the transaction to the estate's heirs; thus, they never gave consent to McKean to make the loans. His representation of the Bergman estate may have been materially limited by his own financial interest in having the company receive the loans. We hold that McKean violated RPC 1.7(b).

■ RPC 8.4(c) prohibits a lawyer from engaging in conduct "involving dishonesty, fraud, deceit, or misrepresentation." RPC 8.4(c). The evidence supports the hearing examiner's finding that the WSBA did not meet its burden of proof that McKean violated this rule. Although McKean acted with bad judgment, the record indicates that his conduct did not rise to the level of violating RPC 8.4(c).

## SANCTIONS

■ As a guide in determining the appropriate sanction, we follow the *American Bar Association's Standards for Imposing Lawyer Sanctions* (1991 ed.) (ABA Standards). *In re Disciplinary Proceeding Against Halverson*, 140 Wn.2d 475, 492, 998 P.2d 833 (2000). The ABA Standards provide a two-step process. First, the presumptive sanction must be determined by considering the ethical duty violated, the lawyer's mental state, and the extent of actual or potential harm caused by the misconduct. *Halverson*, 140

Wn.2d at 492. Second, mitigating and aggravating factors are considered to determine whether they should affect the type or length of the presumptive sanction. *Halverson*, 140 Wn.2d at 493. We review the Board's recommendations, and then determine whether there are any considerations that militate against them. *Halverson*, 140 Wn.2d at 497.

## *Presumptive Sanctions for RPC 1.14*

McKean argues the presumptive sanction for his RPC violations is a reprimand. Lawyer's Br. at 37. The WSBA argues suspension is the appropriate sanction for these violations because McKean's mental state was knowing misconduct. Answering Br. of WSBA at 26.

The Board unanimously adopted the conclusion that McKean violated RPC 1.14 by "commingling personal and client funds in a lawyer's trust account and . . . making ill-advised disbursements of client funds . . . ." DP at 16 (finding 29). The presumptive sanction is suspension "when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client." ABA STANDARDS std. 4.12.

McKean argues his mental state was negligence and no actual harm resulted. Lawyer's Br. at 26. As the WSBA points out, however, the hearing officer listened to McKean's lengthy explanations for "disbursing one client's funds on behalf of another client," and inferred actual or constructive knowledge that his actions were unethical. Answering Br. of WSBA at 31. *See, e.g.*, finding 6 ("Respondent loaned Jim Martin $500.00 from his attorney's trust account without any documentation as to the terms or conditions, and without obtaining permission from the owner of the funds."); finding 13 ("The money to cover these three checks belonged to Respondent's clients, who did not know and have never been informed their funds were used."); finding 20 ("Respondent deposited $5,886.93 in fully earned fees into the trust account and issued checks therefrom to pay his operating and personal expenses.").

McKean himself admits he knew the consequences of making the loans. He writes in his brief to this court, "I told [Martin] that was [sic] not wise for me to help him, but that if I loaned the money to him, it would have to be a short term loan—sixty to ninety days because I was loaning him money from a trust that I was trustee of." Lawyer's Br. at 13. Furthermore, the hearing examiner found that McKean knowingly commingled client funds with his own for a two-week period in 1996. DP at 17. While the record indicates that he did not do so with a dishonest motive, he knew or should have known that commingling client funds with a lawyer's own is a serious violation.

The commentary accompanying ABA Standard 4.12 makes clear that suspension applies when a lawyer mishandles a client's money, even when no ultimate harm comes to the client. "Because lawyers who commingle client's funds with their own, subject the client's funds to the claims of creditors, commingling is a serious violation for which a period of suspension is appropriate even in cases when the client does not suffer a loss." ABA STANDARDS std. 4.12 cmt.

Here, McKean invested clients' funds held in trust, knowing of the Martins' financial troubles and bankruptcy. In doing so he caused potential injury because he made his clients' funds subject to the Martins' creditors. Although McKean was able to borrow money to repay the loans he made from the trust account, he knowingly imperiled his clients' money held in trust. McKean also knowingly commingled client funds with his own for a two-week period in 1996. We thus affirm that suspension is the appropriate presumptive sanction for the violation of RPC 1.14.

### *Presumptive Sanction for RPC 1.8(a)*

The Board unanimously adopted the conclusion that McKean violated RPC 1.8(a) by failing to adequately disclose to the Martins his conflict of interest due to entering into a business transaction with them. DP at 18

(finding 32). The presumptive sanction is suspension "when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to that client." ABA STAN-DARDS std. 4.32.

As argued by the WSBA, there was no dispute that McKean knew that entering into a business transaction with the Martins involved a conflict of interest. McKean even testified himself that he told the Martins that "the Professional Conduct Rules [sic] discourage or frown on attorneys being involved with their clients." RP at 411. McKean, however, "did not sufficiently inform the Martins of the risks inherent in having their attorney as a business associate." DP at 9. The hearing examiner found that there was such a lack of detail in the business agreement that "if Martin had sought counsel from an independent attorney, the advice received would have been general, thus depriving the Martins of making an informed consent." *Id.*

We, therefore, affirm that suspension is the appropriate presumptive sanction for McKean's violation of RPC 1.8(a).

### *Presumptive Sanction for RPC 1.7(b)*

We find a violation of RPC 1.7(b) because McKean's financial interest in the Company may have materially limited his representation of the Bergman estate, given that he had a majority interest in the Company, the Company was financially strapped, and he completely failed to disclose the conflict and secure consent from the estate's heirs. We determine the presumptive sanction by considering the ethical duty McKean violated, his mental state, and the extent of actual or potential harm caused by the misconduct. *Halverson*, 140 Wn.2d at 492.

The record establishes that initially McKean's book-keeper debited the $11,628.25 loan from the ledger of another client for whom he held funds, DiPaula. Then in the fall of 1997, McKean instructed the bookkeeper to

instead debit the loans from the Bergman estate. McKean maintains that he had authority as the personal representative of the estate to loan the money to the Company as part of his nonintervention powers, but no documentation was offered to support his testimony. The loans were to be short term and carry a 12 percent interest rate. McKean fully reimbursed the Bergman estate, with interest, and neither DiPaula nor the estate suffered any actual harm. Nonetheless, he completely failed to disclose the transactions to either client.

The record establishes that McKean was at least negligent in determining whether his financial interest in the Company created a conflict of interest between himself and his representation of the Bergman estate. McKean, however, should have known that there was a conflict of interest adverse to the estate. Suspension is the presumptive sanction for conflicts "when a lawyer *knows* of a conflict of interest . . . ." ABA STANDARDS std. 4.32. The presumptive sanction is a reprimand "when a lawyer is negligent in determining whether the representation of a client may be materially affected by the lawyer's own interests, or whether the representation will adversely affect another client, and causes injury or potential injury to a client." ABA STANDARDS std. 4.33. We hold that a reprimand is the appropriate sanction for McKean's violation of RPC 1.7(b).

### *Mitigating Factors*

 We next evaluate whether the Board correctly considered mitigating[13] and aggravating[14] factors when determining the proper sanctions. The Board did not con-

---

[13] Mitigating factors include: "(a) absence of a prior disciplinary record; (b) absence of a dishonest or selfish motive; (c) personal or emotional problems; (d) timely good faith effort to make restitution or to rectify consequences of misconduct; (e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (f) inexperience in the practice of law; (g) character or reputation; (h) physical disability; (i) mental disability or chemical dependency including alcoholism or drug abuse . . . ; (j) delay in disciplinary proceedings; (k) imposition of other penalties or sanctions; (l) remorse; (m) remoteness of prior offenses." ABA STANDARDS Std. 9.32 (1991 ed. & Feb. 1992 Supp.).

sider whether any mitigating and aggravating factors should affect the type or length of the presumptive sanction for the violation of RPC 1.7(b), since the Board did not find a violation. All of the violations in this case, however, occurred under a common scheme; thus, we will evaluate the mitigating and aggravating factors to determine the sanction that is appropriate for the entirety of the violations.

McKean did not have any personal or emotional problems at the time. His use of client funds "was for his own convenience and was a serious lapse in judgment." DP at 17. The hearing examiner noted McKean was cooperative during the disciplinary proceedings. He suffered adverse consequences when he was forced to borrow $23,000 to pay the loans back to his trust account and satisfy other obligations on behalf of the Martins. The hearing examiner also noted McKean had sought the help of another attorney to control all of his trust account activity. Finally, the hearing examiner noted no one was actually damaged, despite the potentially serious harm to client funds. We affirm the hearing examiner's conclusion that the "mitigating and aggravating factors balance themselves out in weight but not number."

The hearing examiner recommended a one-year suspension from practice, followed by a six-month probation. The Board unanimously adopted the findings and conclusions, but reduced the suspension to six months by a vote of seven to three (the dissenters recommending one-year suspension). DP at 2-3.

We have exclusive responsibility to impose discipline on attorneys for professional misconduct and are not

[14] Aggravating factors include: "(a) prior disciplinary offenses; (b) dishonest or selfish motive; (c) a pattern of misconduct; (d) multiple offenses; (e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency; (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process; (g) refusal to acknowledge wrongful nature of conduct; (h) vulnerability of victim; (i) substantial experience in the practice of law; (j) indifference to making restitution; (k) illegal conduct including voluntary use of controlled dangerous substances." ABA STANDARDS Std. 9.22 (1991 ed. & Feb. 1992 Supp.).

bound by the Board's sanction recommendation. *Halverson*, 140 Wn.2d at 497. To depart from the recommendations, however, we must be persuaded the sanctions are inappropriate based upon consideration of the following factors:

"1. The purposes of attorney discipline (sanction must protect the public and deter other attorneys from similar misconduct);

"2. The proportionality of the sanction to the misconduct (sanction must not depart significantly from sanctions imposed in similar cases);

"3. The effect of the sanction on the attorney (sanction must not be clearly excessive);

"4. The record developed by the hearing panel (sanction must be fairly supported by the record and must not be based upon considerations not supported by the record); and

"5. The extent of agreement among the members of the Board (sanction supported by unanimous recommendation will not be rejected in the absence of clear reasons)."

*Tasker*, 141 Wn.2d at 565-66 (quoting *In re Disciplinary Proceeding Against Haskell*, 136 Wn.2d 300, 317-18, 962 P.2d 813 (1998)).

■ "The purpose of lawyer discipline proceedings is to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely to properly discharge their professional duties to clients, the public, the legal system, and the legal profession." ABA STANDARDS std. 1.1. Here, although McKean now has another attorney managing his trust account, this alone does not adequately address his profound lack of professional judgment in making numerous decisions surrounding his involvement with the Martins' bankruptcy and business. Furthermore, McKean's arguments before us suggest he does not understand the ethical violations he committed when making the loans from his trust account.

■ Suspension, followed by the probationary requirements recommended by the Board, is thus appropriate. Furthermore, suspension should generally be no less than six months. ABA STANDARDS std. 2.3 cmt. We note that the

Board has already recommended reducing McKean's suspension by half of the one year the hearing examiner would have imposed. Although the Board was not unanimous, the dissenters would have affirmed the one-year suspension.

McKean argues a six-month suspension is not proportional to sanctions in similar cases. He argues that his brief commingling is not as serious as the violations in cases in which we have sanctioned with suspension. He does not, however, take into account the imprudent loans he made of client funds or the violations of the conflicts rules (RPC 1.7(b) and 1.8(a)). The cases he cites, therefore, support suspension as proportional to his offense rather than refute it.

█ McKean also argues a six-month suspension is excessive because it will harm him financially. Lawyer's Br. at 56-58. We have held, however, that "personal financial problems, however severe, are not a mitigating factor" in attorney discipline. *In re Disciplinary Proceeding Against Curran*, 115 Wn.2d 747, 774, 801 P.2d 962 (1990).

Because the suspension is the correct presumptive sanction and is based on the record, and we are not persuaded that it is inappropriate or excessive in these circumstances, we impose the Board's recommendation of a six-month suspension followed by six months' probation, with the conditions recommended by the hearing examiner. These conditions require that, after his suspension and during probation, McKean not practice law until he demonstrates a familiarity in managing trust accounts to the satisfaction of the Disciplinary Counsel and completes 10 hours of live continuing legal education credits on conflicts of interest. DP at 24.

## CHALLENGE TO COSTS

McKean requests that the disciplinary costs and expenses of $8,906.90 imposed against him be dismissed or reduced. Lawyer's Br. at 59. The WSBA argues he waived

this argument by not raising it before the hearing board. Answering Br. of WSBA at 55.

RLD 5.7 provides an attorney against whom costs and expenses are assessed must file a review of the assessment with the Board within 10 days of service upon the lawyer. RLD 5.7(e)(1). Here, there is no record McKean filed this review; therefore, he waived this argument and the assessment against him stands.

## CONCLUSION

We affirm the findings and conclusions adopted by the Board, as well as the recommended six-month suspension and six-month probation with the conditions provided. We also affirm the assessment of costs and expenses against McKean.

ALEXANDER, C.J.; MADSEN, SANDERS, IRELAND, BRIDGE, CHAMBERS, and OWENS, JJ.; and SMITH, J. PRO TEM., concur.